101 N.J. Super. 61 (1968)
243 A.2d 253
GRAULICH CATERER INC., PLAINTIFF-APPELLANT,
v.
HANS HOLTERBOSCH, INC., DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued March 4, 1968.
Decided May 15, 1968.
*62 Before Judges SULLIVAN, FOLEY and LEONARD.
Mr. John J. Flynn argued the cause for appellant (Mr. Thomas E. Durkin, Jr. attorney).
Mr. Samuel Weitzman argued the cause for respondent (Messrs. Weitzman, Brady & Weitzman, attorneys).
The opinion of the court was delivered by FOLEY, J.A.D.
Plaintiff, caterers, take this appeal from a judgment for defendant rejecting plaintiff's suit sounding in contract. Entering this order, the trial court determined the relationship of the parties to be noncontractual, finding that a "letter of intent" signed by defendant and containing "open terms essential to a contract of this nature, did not *63 constitute a contract but was merely an expression of agreement to enter a contract embodying more specific terms * * *." Testing the propriety of this ruling requires a careful historical examination of the relationship of the parties.
Contact between the litigants sprung from the turmoil surrounding the preparations for the opening of the 1964 New York World's Fair. Holterbosch, an American importer and distributor of Lowenbrau beer, was granted the franchise to operate the Lowenbrau Pavilion at the Fair. Final approval of this award was given on or about January 15, 1964 and contemplated an April 15, 1964 opening. This was the last major pavilion awarded, making time essential in all of defendant's considerations.
In aid of this enterprise defendant engaged a metropolitan-based industrial design consultant, Becker & Becker Associates, to formulate a feasible production plan for serving the required beer and, as a desired adjunct, platters of German food. As stated by defendant, the goal of both Lowenbrau and Holterbosch was the "quality concept of merchandising."
The Raytheon Corporation, knowing the Becker firm's privy role and eager to market their microwave concept of cooking, suggested plaintiff's name to Becker as one able to discharge the culinary requirements of the Lowenbrau Pavilion. Thus approached by Becker, plaintiff on March 10, 1964 entered into preliminary negotiations with the consultant regarding the feasibility of the Raytheon microwave cooking concept as related to the superior quality of food desired by defendant. Briefly, microwave preparation depends upon platters of food prepared and frozen at a central commissary and stored at the place of distribution and/or consumption. Receiving an order for food, the vendor places the frozen, nearly "done" food platter into a Raytheon microwave oven, which "reconstitutes" the frozen food to the desired degree of "doneness." The unit then may be served to the customer. The direct microwave primarily heats, but also serves as a minimal cooking agent bringing the platter *64 to the desired temperature and "doneness" simultaneously. The entire process of reconstitution is completed in a matter of seconds or minutes, depending on the nature and state of the stored units.
At the March 10, 1964 meeting Becker and another employee of the planning firm reviewed with approval ten general food samples submitted by Graulich. Defendant Holterbosch did not personally attend this initial meeting. Informed of defendant's needs, plaintiff redesigned the samples and presented eight platters at a second meeting held on March 17, 1964. This was attended by two Becker employees, Holterbosch, a chef from a German-based steamship company, Graulich and an employee of plaintiff corporation.
Defendant was impressed by six of the samples, recalling at trial that "the food was good, the quality was obvious. It was well prepared." From this date defendant was committed to the microwave concept of satisfying his desire to complement the Lowenbrau beer with an appropriate German cuisine of high quality.
The samples presented and approved on March 17, 1964 were prepared in the Graulich commissary at Port Elizabeth, New Jersey, by plaintiff's employees and were presented to defendant at the Raytheon office in New York City. The operation was agreed upon, with the initial delivery set for April 15, 1964. Daily preparation was to be based on the orders transmitted by defendant to plaintiff's commissary, with daily delivery of the orders made between midnight and 8 A.M. Consumption, theoretically, was to be on the day of delivery. Although the number of units was to fluctuate in relation to the many variables of the operation, the figure of 1,000,000 units was used in estimating the tentative demand for the initial year. Service of the food was to be made on specially designed and colored plastic platters which were required by defendant.
Before confirming basic purchases of raw food products, plastic platters, storage trays and transportation dollies, plaintiff requested of defendant a deposit of $50,000 as a *65 contract security. Noting its already large investment, and finding the request unacceptable, defendant cited plaintiff's obligation to bear some of the business risk attendant to ventures of this type.
Plaintiff then submitted a letter of general intention, dated April 1, 1964, requesting defendant's signature as approval. This letter purported to be an interim agreement demonstrating the bona fides of the parties to be bound until a formal contract documenting the specifications could be executed at a later date. Defendant signed the letter in plaintiff's presence, but before the signing a "rider" was incorporated stating that the letter indicated "intent only." It also reiterated the desire for an early drafting of the menu specifications, and provided for a cancellation clause in the event the product fell below the established standards.
In reliance on this agreement plaintiff contracted with suppliers for platters, trays and dollies, which, coupled with labor expenses, totaled $29,937 after adjustments. This sum, plus a projected profit figure of $35,950, was claimed by plaintiff as the amount of damages in its suit.
Returning to the chronology of events, plaintiff, after purchasing its component materials, established a production line commissary at the Jamaica City, Long Island, plant of Met Provisions, where the operation was to be supervised by plaintiff's personnel. This change of commissary site was made in an effort to comply with the Fair requirements of union labor and federal food inspection. A Long Island commissary had the additional delivery advantage of neighboring the Fair. Met also directly supplied plaintiff's raw food product for this venture, as it had, indirectly, through a New Jersey distributor for enterprises in the past. Plaintiff's production of deliverable product awaited only defendant's order.
The delayed and muddled opening of the Fair brought the parties into daily, and at times even hourly, contact. Postponements followed premature orders until a firm order for April 23, 1964 was placed by Mr. Leigh, an employee of *66 Becker & Becker. Upon delivery the members of defendant's organization were stunned by the product and complained immediately that the tendered units did not, in any way, match the contract samples. Rejecting this 955-unit installment as unacceptable, defendant described the food as "bland," unpresentable, tasteless and "just wasn't the type of food that we could sell." Notwithstanding this low grade delivery, defendant, obligated to the Fair to serve food and committed in theory to the Raytheon ovens, conferred with the equally dissatisfied plaintiff in seeking to improve the quality standard of the product to the point where it would be acceptable. Plaintiff's effort to improve the quality of the units was aided by Becker and defendant's pavilion personnel manager, Mueller, as well as the special foods chef from the "VIP" section of defendant's exhibit.
The second delivery, made on April 25, 1964, was likewise unacceptable. Of the 2520 units delivered, between 500 to 700 were distributed among the employees and patrons of the exhibit for a fast reaction. The complaints in response to the food were many and varied. Defendant, describing the sources of unfavorable comment, stated that the sauerbraten was dry and the gravy, pasty and unpalatably "gooey," surrounded rather than enveloped the meat. The knockwurst platter suffered similarly, being dry and comparing unfavorably with the standards established by the samples. Generally, defendant complained that the food was simply not "German food" and as such was unacceptable for the Lowenbrau Pavilion.
Following the failure of the second delivery Holterbosch claimed that plaintiff took no further curative measures, while plaintiff protested that defendant was "not available" following the second and last delivery of April 25, 1964. Graulich stated that he was told through Becker that plaintiff's food would be unsuitable for the Lowenbrau Pavilion. Becker, affirming the nonconformity of the deliveries, denied terminating the relationship and insisted that such an act was beyond his authority as an agent.
*67 Hellmuch Laufer, defendant's pavilion factotum, affirmed hearing Graulich verbally acknowledge Holterbosch's complaints. Laufer agreed that the second delivery was qualitatively no different than the first, stressing that plaintiff's efforts to cure the unpalatable food failed. This witness, joined by Mueller and the "VIP" chef, converted the microwave cooking area into a conventional kitchen using pot burners to successfully prepare the food served for the duration of the Fair.
The trial court on these facts determined the relationship of the parties to be noncontractual. Our review of the relevant legal principles indicates that this characterization was improper. The analysis of the pertinent issues is divided into four parts, the first of which relates to the choice of law.
Noting the presence of diverse jurisdictions (New York and New Jersey) the trial court properly made New Jersey's jurisprudence its choice of law since no pleading or notice of foreign law was made at trial by either party. Leary v. Gledhill, 8 N.J. 260 (1951); Donnelly v. United Fruit Co., 75 N.J. Super. 383, 397 (App. Div. 1962), affirmed 40 N.J. 61 (1963). Since the trial dates antecede the adoption of the New Jersey Rules of Evidence (September 11, 1967), these rules are negatively considered in determining them inapplicable. According to New Jersey law the status of the parties and the effectiveness of the April 1, 1964 instrument must be construed under the relevant sections of the Uniform Commercial Code adopted prospectively in this State from January 1, 1963, N.J.S. 12A:10-106.
Plaintiff asserts that the April 1 letter of intention contractually bound defendant and defendant became liable to plaintiff for the damages resulting from a breach of that agreement. In response defendant, denying the allegations of the complaint, alleged that the "letter of intention" was not an enforceable agreement since it contemplated the subsequent execution of a formal contract. Alleging that plaintiff breached the express warranties of sample, and the implied warranties of merchantability and fitness for purpose, *68 defendant counterclaimed for damages caused by the breach. This counterclaim, withdrawn at trial, forms no part of the issues on appeal.
The letter signed on April 1, 1964 and the accompanying rider are critical to an analysis of the legal status of the parties.
They follow in order:
"Dear Mr. Holterbosch:
We will be prepared to deliver to the Lowenbrau Exhibit of the New York World's Fair and for the duration of your exhibit, our food products according to the following menu:
1. Knockwurst w/Saurkraut, 3 slices Small Bread
2. Saurbraten w/Red Cabbage, 3 slices Small Bread
3. Fair Sandwich w/German Potato Salad, Ham, Pastrami, Cheddar Cheese on Whole Grain Rye
4. Westphalian Ham on Pumpernickel w/German Potato Salad
5. Westphalian Ham, Cheddar Cheese w/German Potato Salad, 3 slices Small Bread
6. German Bologna and Sausage w/German Potato Salad, 3 slices Small Bread
Our contract will contain guarantees as to the quality and specific portions to be used on each plate. We further agree to variations within existing platters and will substitute new menu items as required by the operation.
All of these products will be delivered daily between the hours of 12 midnight and 8 A.M. in a quantity determined by your management which will become a binding daily commitment to us. Our company will set up the quantity control system and supervise the placing of the daily orders to retain the par stock as established within the storage facilities of the pavilion. All food will be delivered in portable containers; the cost of transportation and containers will be borne by us.
The per item cost to you will be at the rate of sixty cents (60) per item with a minimum four (4) week order of 120,000 units required to sustain this price. If this minimum is not delivered during this period, the per item price will be sixty-five (65) per unit delivered. If during this same period 200,000 units are delivered, the price will reduce to fifty-five (55) per unit.
Billing will be daily with statements issued weekly payable upon presentation.
We additionally guarantee that neither the food nor platter will be used by anyone else during the term of our agreement. Conversely, it is agreed that you will purchase these above named items from no other source than our company during the length of our agreement. We propose that this agreement be for the year 1964. If this agreement meets with your approval, will you please sign the enclosed *69 copy which will serve for an interim agreement until a formal contract can be prepared. It is understood that the Rider No. 1 dated 4.1.64, is part of this letter of intent.
 [s/William Graulich, III on original]"
 Rider I.
"It is understood that this letter indicates intent only and that a detailed contract will be drawn as soon as possible which will contain complete and detailed specifications on quality and quantity of food and details of service. Such a contract will also contain the necessary protective provisions relating to cancellation in the event that quality of product or service falls below the established standards.
[s/by defendant on copy]"
Construing the letter as expanded by the rider, the trial court found the questions of termination and quality to be "essential and that until these terms were reduced to finalize contract form there was no contract."
This finding was rooted in the court's belief that because the rider materially changed the terms of the letter, no contractual relation could arise until the new terms of this modifying rider had been met by plaintiff's performance.
In our judgment the ruling reflects pre-Code contract law requiring acceptances that "mirror" offers, and is discordant with the Code reasoning which is based upon a determination of the intention of the parties as evidenced by their conduct or writings N.J.S. 12A:2-201, 202, 204 (2), (3).
Before any writing the parties agreed upon quality as typified by the six samples approved on March 17, 1964. Satisfied with the quality of the food, their minds met and they became firmly committed to the microwave method of preparing the food. Over defendant's signature the letter, composed by plaintiff, contains concrete references to: (1) the place and time of installment delivery; (2) the menu, specifically describing the six platters to be served; (3) quality controls to be enunciated in the supplemental formal contract; (4) optional provisions for menu changes; (5) a sliding quantity commitment clause with corresponding price provisions; (6) the method of delivery; (7) installment billing provisions; (8) an exclusive dealing clause binding buyer, and (9) the time-term of the contract. The "rider" *70 composed by defendant restated the intention of the parties to execute subsequent articles of contract. It also supplemented the express warranties, inherent in this sale based on samples, by expressly modifying plaintiff's treatment of quality control, providing for cancellation "in the event that quality or service falls below the established standards" (viz., the samples approved on March 17, 1964). Plaintiff expressed no concern over the form of this letter agreement so expanded by defendant's rider, and defendant's consent is unilaterally made manifest by his signature.
These documents and the actions of the parties bespeak a contractual relationship. Certainly, Graulich's position would have been more secure if the initial capital investment on the venture was backed by a $50,000 deposit. Nevertheless, although defendant refused to make the deposit, plaintiff's bargain was secured by the totality of defendant's commitment. Plaintiff's only limitation under the contract related to its ability to supply the same quality food from the Long Island production commissary as warranted by the original samples prepared at its home commissary in New Jersey.
To enforce this quality control defendant issued the pertinent relative clause of the rider in the present tense, "in the event that quality of product or service falls below the established standards." This protective clause depended upon quality standards established by the samples, tastetested and approved by defendant before the agreement and rider were drafted. By using the words "in the event" the draftsman contemplated a subsequent situation which would arise if the "quality of product or service falls below" the standards of the samples. Therefore, when defendant signed under the letter and rider he could, and did, enter into a contractual state secured by the express warranties of the samples and the condition subsequent incorporated by the rider.
The Code N.J.S. 12A:1-102, 103, comprehending reasonable commercial practices, liberalized the formalities of the *71 common law relating to strict compliance with the statute of frauds; and with formation, readjustment and performance of contracts, as well as the individual remedies for contractual breach. Anderson's Uniform Commercial Code (1961) § 2- § 103.2; Corman, "Uniform Commercial Code," 17 Rutgers L. Rev. 1, 14 (1962). See also Hawkland, Sales and Bulk Sales, c. 1, p. 2 (1958). By recognizing the commercial reality of cure, and the allocation of the risk of loss to insurance, this uniform legislation favoring established relationships has eliminated much of the mindbending logic that went into the construction of conditional terms appearing in pre-Code circumstances. Compare 3A Corbin on Contracts, §§ 628, 629 (1960) (1964 Supp.). While not previously expressed in New Jersey, the Code, N.J.S. 12A:2-204, mandates constructions that favor "a liberal policy regarding formation of contracts of sale." Associated Hardware Supply Co. v. Big Wheel Distributing Co., 355 F.2d 114, 120 (3 Cir. 1965); Hawkland, Sales and Bulk Sales, supra, c. 1, p. 2. The uniformity of remedies N.J.S. 12A:2-701 to 725 provides adequate safeguards counterbalancing the Code's predisposition to determine a relationship contractual. Notwithstanding this predilection, sales of goods where, as here, the price term exceeds $500, must comply with the statute of frauds to be legally enforceable.
On the instant facts the "specially manufactured goods" exception to the statute is immaterial since the quantity term is expressed with the requisite certainty (see N.J.S. 12A:2-306(1) re requirements clause) and the document signed by the party "against whom enforcement is sought." N.J.S. 12A:2-201(1). The instrument, if it evidences contractual intent, is enforceable under the statute of frauds.
The modes for formation of contracts are described generally by N.J.S. 12A:2-204:
"(1) A contract for sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract.
*72 (2) An agreement sufficient to constitute a contract for sale may be found even though the moment of its making is undetermined.
(3) Even though one or more terms are left open a contract for sale does not fail for indefiniteness if the parties have intended to make a contract and there is a reasonably certain basis for giving an appropriate remedy."
The New Jersey study comment relating to § 3 cites Mantell v. International Plastic Harmonica Corp., 141 N.J. Eq. 379 (E. & A. 1947). The commentators summarize:
"In that case a manufacturer agreed to supply a distributor with its total output of harmonicas up to a certain maxima, `at the lowest price and with the highest discount' given to any other distributor in the United States. The manufacturer subsequently selected another distributor, contending that the first contract was unenforceable because of lack of definiteness. The court held that the contract was enforceable. In articulating the rule of the case, the court took a dim view of the defense of lack of definiteness where commercial contracts are involved." N.J.S. 12A:2-204(3), comment, p. 115.
As stated, price, time delivery, quantity and quality terms are all contained in the interim contract agreement. The only indefiniteness is the absence of a formula clause relating to the quality of the component ingredients in each platter. Therefore, the contract being of apparent certainty, it affords a rational basis for supplying appropriate remedies in the event of breach, provided the parties "have intended to make a contract."
The contractual intention of the parties may be evidenced by their conduct, N.J.S. 12A:2-204(1), and the agreement N.J.S. 12A:2-204(2). The agreement satisfying the statute of frauds was made on the determined date of April 1, 1964. It is expressly not intended to be an integration. Thus, parol or extrinsic evidence may be used to explain the interim agreement, or, to use a more Code-oriented term, the confirmatory memorandum. N.J.S. 12A:2-202. The parties use the commercial words "contract", "agreement" and "cancellation." Defining these words, the Code, N.J.S. 12A:2-106(1), limits them to the present or future sale of goods. The same section describes a "contract for sale" as including *73 both present and future sales of goods. The agreement signed by defendant here purported to be for the year 1964. This contract period formed at defendant's request extended over nine months. When read in conjunction with defendant's protective rather than conditional cancellation clause, this documents an "agreement" intended to constitute an installment contract precedently unconditioned.
Were this internal analysis of the instrument not enough to evince a meeting of the minds, and here we think it did, the conduct of the present parties was, of itself, sufficient ground to establish a contractual relationship. The haste necessary to complete preparations for the Fair; plaintiff's creation of a Long Island commissary and its capital investment in the component materials; defendant's absolute commitment to plaintiff's unconventional theory of preparation  all demonstrably indicate conduct, or a course of dealing, that recognized the existence of a mutual contractual intention. N.J.S. 12A:2-204(1). Guided by this reasoning we find that the parties intended to be contractually united from the time defendant signed the April 1, 1964 "interim agreement." Accordingly, we find the trial court's noncontractual characterization of the instant relationship erroneous.
Prescinding from the merits we take up the scope of this review. The record of appeal presents a full trial transcript in which the evidential background upon which each litigant relies is clearly stated. The parties have submitted supplemental briefs informatively keying the relevant facts to the "Performance," "Breach," and "Repudiation" parts of the Uniform Commercial Code. Plaintiff, apparently anticipating the possibility of a determination that a contractual relationship existed, requests a remand to the trial division for "full finding of fact." Defendant has requested this court to make a full disposition of the case on the merits.
Both the law and facts are clear. Therefore, we invoke our power to exercise original jurisdiction as conferred by R.R. 1:5-4(b), R.R. 2:5.
*74 Giving due regard to the original trier's opportunity to observe the demeanor and to judge the credibility of the witnesses, we find as a matter of fact that the deliveries of April 23 and 25, 1964 did not conform to the samples originally presented and approved. Since warranties of sample and description are characterized as "express warranties," the "whole of the goods shall conform to the sample or  model." N.J.S. 12A:2-313(1)(c). The "goods" to "conform" to the sample or model must be "in accordance with the obligations under the contract" N.J.S. 12A:2-106(2); here, to comply with the standards established by the March 17 taste-test of the samples. Any distinguishing language would be controlled by the sample as presented on March 17. Additionally, the implied warranty of fitness for purpose attaches to contracts of this type, where, as here, they are not specifically excluded. A breach of these warranties triggers a buyer's rights following seller's breach as catalogued in N.J.S. 12A:2-711. These remedies include, but are not limited to, cancellation N.J.S. 12A:2-711(1), 2-106(4) "if the breach goes to the whole of the contract." N.J.S. 12A:2-612(3).
N.J.S. 12A:2-612 discloses the rights of the parties to installment contracts:
"(1) An `installment contract' is one which requires or authorizes the delivery of goods in separate lots to be separately accepted, even though the contract contains a clause `each delivery is a separate contract' or its equivalent.
(2) The buyer may reject any installment which is non-conforming if the non-conformity substantially impairs the value of that installment and cannot be cured or if the non-conformity is a defect in the required documents; but if the non-conformity does not fall within subsection (3) and the seller gives adequate assurance of its cure the buyer must accept that installment.
(3) Whenever non-conformity or default with respect to one or more installments substantially impairs the value of the whole contract there is a breach of the whole. But the aggrieved party reinstates the contract if he accepts a non-conforming installment without seasonably notifying of cancellation or if he brings an action with respect only to past installments or demands performance as to future installments."
*75 Here, Holterbosch had the right to reject any installment that was nonconforming, provided that the nonconformity substantially impaired the value of that installment and could not be cured. N.J.S. 12A:2-612(2). "Cure," novel to New Jersey's jurisprudence, permits the seller to cure a defective tender through repair, replacement or price allowance if he reasonably notifies the buyer of his curative intention and, in effecting the cure, makes a timely conforming delivery. N.J.S. 12A:2-508(1).
The effect of the installment contract section, N.J.S. 12A:2-612(2), is to extend the time for cure past the contract delivery date for that nonconforming installment, provided the nonconformity does not "substantially [impair] the value of that installment" and can be cured. We find that Holterbosch was justified in rejecting Graulich's tender of the April 23 initial installment since the nonconformity of the tendered goods with the accepted sample was incurable, and thus substantially impaired the value of that installment.
Replacing considerations of anticipatory repudiation and the material injury with the test of substantial impairment, N.J.S. 12A:2-612 adopts a more restrictive seller-oriented approach favoring "the continuance of the contract in the absence of an overt cancellation." See Comment to § 12A:2-612, par. 6; also New Jersey Study Comment par. 2; Hawkland, supra, 3, c. (3), p. 116. To allow an aggrieved party to cancel an installment contract, N.J.S. 12A:2-612(3) requires (1) the breach be of the whole contract which occurs when the nonconformity of "one or more installments substantially impairs the value of the whole contract;" and (2) that seasonable notification of cancellation has been given if the buyer has accepted a non-conforming installment.
What amounts to substantial impairment presents a question of fact. Analyzing this factual question, the New Jersey commentators counsel that the test as to whether the nonconformity in any given installment justifies cancelling the entire contract depends on whether the nonconformity *76 substantially impairs the value of the whole contract, and not on whether it indicates an intent or likelihood that the future deliveries also will be defective. Continuing, the Comment relates the intent underlying a breach to insecurity and those sections of the Code providing buyer with adequate assurance of performance, § 2-609, and anticipatory repudiation, § 2-610. More practical in its treatment of "substantial impairment", the official Comment states that "substantial impairment of the value of an installment can turn not only on the quality of the goods but also on such factors as time, quantity, assortment and the like. It must be judged in terms of the normal or specifically known purposes of the contract." Comment to § 2-612, par. 4; also, Hawkland, supra, at p. 117.
At the Lowenbrau Pavilion on April 23, 1964 plaintiff Graulich, timely noticed of the nonconforming initial tender, gave assurance that future tenders would be cured to match the original samples. Unequivocally committed to the microwave kitchen method, defendant lent plaintiff three members from its staff in aid of this adjustment. Since plaintiff was given the opportunity to cure, there is no need to touch upon the substantiality of the initial nonconforming installment.
The second installment tender was as unsatisfactory as the first. The meat was dry, the gravy "gooey" and the complaints abundant. After the nonconforming second delivery it became apparent that eleventh-hour efforts attempting to rework and adjust the platters failed. Translating this into legal parlance, there was a nonconforming tender of the initial installment on a contract for the sale of goods; upon tender the buyer Holterbosch notified the seller Graulich of the nonconformity and unacceptable nature of the platters tendered; the failure of the cure assured by plaintiff, seller, was evidenced by a subsequently defective nonconforming delivery. The second unacceptable delivery and the failure of plaintiff's additional curative efforts left defendant in a position for one week without food. Time was critical. Plaintiff knew that platters of maximum quality were required on *77 a daily installment basis. Because of defendant's immediate need for quality food and plaintiff's failure to cure, we find that the nonconformity of the second delivery, projected upon the circumstances of this case, "substantially impair[ed] the value of the whole contract [and resulted in] a breach of the whole" N.J.S. 12A:2-612(3). If the breach goes to the whole contract the buyer may cancel the whole contract. N.J.S. 12A:2-711(1). Accordingly, we find that Holterbosch was justified in cancelling the installment agreement signed on April 1, 1964.
Since defendant's counterclaim was withdrawn it is unnecessary to treat of the right retained by a cancelling party to press any remedy for breach of the whole contract. N.J.S. 12A:2-106(4).
Judgment in favor of defendant for the reasons herein stated. Costs to defendant.