**HOLIDAY MANUFACTURING COMPANY, a Division of U. S. Industries, Inc., a corporation, Plaintiff,**

**v.**

**B.A.S.F. SYSTEMS, INC., a corporation, Defendant.**

Civ. No. 71-O-423.

United States District Court, D. Nebraska.

Aug. 2, 1974.

Swarr, May, Smith & Andersen, Omaha, Neb., for plaintiff.

Malcolm D. Young, Omaha, Neb., for defendant.

## MEMORANDUM OPINION

SCHATZ, District Judge.

This matter came on for trial to the Court in an action commenced by Holiday Manufacturing Company against B. A.S.F. Systems, Inc. The suit was brought originally in the District Court for Hall County, Nebraska, and was duly removed by the defendant to this Court. Jurisdiction is based on 28 U.S.C. § 1332, and diversity of citizenship and the requisite amount in controversy are established.

The plaintiff is a Nebraska corporation which manufactures plastics products. The defendant is a Massachusetts corporation which, among other things, purchases plastic cassettes and loads them with blank magnetic tape for sale to corporations which imprint music or the spoken word on the tape.

It is uncontroverted that there existed a contract between the plaintiff and the defendant for the manufacture and sale of six million plastic cassettes, although the terms of this contract are disputed in some respects. It is also uncontroverted that on April 5, 1971, the defendant cancelled this contract and others with the plaintiff, citing for its reasons "continuous quality problems and delivery delays." The plaintiff asserts that this cancellation was unwarranted, that any non-conformity in the cassettes was caused by changes required by the defendant from the original drawings, and that, therefore, the defendant is liable to the plaintiff for damages for wrongful cancellation. The defendant denies wrongfully cancelling and counterclaims alleging that the plaintiff's failure to produce goods conforming to the contract caused the defendant substantial monetary loss.

The actions of the parties relevant to the issue of wrongful cancellation occurred during the time from November of 1969 through April of 1971 and are listed chronologically by the Court as follows:

1) On November 21, 1969, Mr. E. Maschka of B.A.S.F. wrote Holiday soliciting a price quotation on a plastic cassette B.A.S.F. wished to purchase. Drawings for the cassette itself and all necessary parts were included, but the drawings were in German and used

metric measurements and were for a screw-fastened cassette, whereas the cassettes B.A.S.F. wished to purchase were sonic-welded.

2) On December 18, 1969, Mr. O. Mueller, President of Holiday, quoted B.A.S.F. a price of $.14144 per cassette for six million sonic-welded cassettes and $17,000 for the required tooling, i. e., the molds Holiday would use in its injection molding process to manufacture three parts of the cassette. The other parts were to be purchased by Holiday either from B.A.S.F. itself or from other suppliers.

3) On December 23, 1969, B.A.S.F. sent Holiday a purchase order for the tooling and on January 14, 1970, a purchase order for the cassettes (Purchase Order No. 20080), both at the prices quoted by Mr. Mueller on December 18. These purchase orders were accepted by Holiday on January 23, 1970.

4) According to the cassette purchase order, delivery by Holiday was to commence in April of 1970 at the rate of five hundred thousand cassettes per month, and although the purchase order did not specifically so state, the Court concludes that shipment was to continue at that rate until delivery of the entire six million was completed.

5) English drawings for the cassette parts were received by Holiday on about January 19, 1970.

6) The tooling purchase order required Holiday to produce an eight-cavity cassette body mold which would produce four cassette tops and four bottoms at each shot. Holiday subcontracted this work, but the subcontractor did not commence work until February or March of 1970. Tooling for the first top and bottom cavity was not ready for a test shot until mid-April. Tooling for the second such cavity was not completed until mid-May, and the tooling for the final two such cavities was not completed until July.

7) On March 13, 1970, Mr. T. Magner of B.A.S.F. sent Holiday a copy of I.M.S.–A.100 Revision Two, which constituted B.A.S.F.'s standards for determining the acceptability of cassettes and included a sampling plan. This document did not vary the dimensional requirements previously given by B.A.S.F. to Holiday in the German and English drawings. This document stated that the M.I.L.–S.T.D. 105 D.C. Single Sampling Plan, which was a plan commonly used by manufacturers, would be used by B.A.S.F. to evaluate the cassettes, with an acceptable quality level of 2.5 per cent for major defects and 6.5 per cent for minor defects. A few examples of each type of defect were stated.

8) On March 27, 1970, samples of the cassette hubs and rollers which had been manufactured by Holiday from tooling built by Holiday at its own plant, were sent to B.A.S.F. for approval. B.A.S.F.'s inter-office correspondence indicated that B.A.S.F. tested and approved these parts as early as April 9.

9) On approximately April 14, Holiday made its first test shot of cassette halves. Shortly thereafter, Mr. L. Beauvais of B.A.S.F. visited the Holiday plant, and he and Holiday officials jointly determined these cassette halves to be inadequate due to "sink" (or shrinkage) on the surface. The problem was determined to be related to the energy directors, which are small raised portions on the cassette halves used in sonic-welding. Sonic-welding is a process by which high frequency sound is applied to the cassette halves, generating frictional heat at the energy directors, which results in a fusion of the two halves. Following this discussion by Holiday and B.A.S.F. officials, adjustments were then made in the tooling to correct the "sink" problem.

10) Although Holiday did not deliver five hundred thousand cassettes in April, the evidence does not disclose any form of protest by B.A.S.F. concerning this failure to comply with the terms of Purchase Order No. 20080.

11) On May 28, 1970, B.A.S.F. notified Holiday that sample cassette halves had been accepted mechanically.

12) By June 1, 1970, B.A.S.F. had given Holiday a list of gauges and pro-

cedures which B.A.S.F. recommended Holiday use to test the dimensions and strength of the cassette parts.

13) On June 4, 1970, B.A.S.F notified Holiday that all cassette parts had been tested and met B.A.S.F. specifications, with three exceptions. On June 10, 1970, the test results were sent to Holiday, and they indicated that only one of the exceptions—"sink" in the upper left corner—was serious. On June 22, 1970, B.A.S.F. notified Holiday that two hundred assembled cassettes had been functionally tested with a two per cent rejection rate. The Court concludes from the correspondence of May 28, June 4, June 10, and June 22, that B.A.S.F. accepted the cassette produced by Holiday at that time.

14) On June 24, B.A.S.F. notified Holiday of a further test of assembled cassettes which revealed 8.7 per cent and 10 per cent rejection rates for assembly-oriented defects. B.A.S.F. related to Holiday several criticisms of the Holiday operation, but no dimensional test results or supporting data were furnished. As a result of this criticism, Holiday stopped production for approximately two days to correct the defects.

15) On June 25, 1970, B.A.S.F. received from Holiday a shipment of twenty-nine thousand eight hundred cassettes under Purchase Order No. 20080 which were rejected by B.A.S.F. on June 30 due to cracks in the knock-out tabs and overweld around the perimeter of the cassette.

16) In the latter half of July and early August, a number of small shipments of both assembled and unassembled cassettes were requested from Holiday and received by B.A.S.F. There is no indication that B.A.S.F. accepted or rejected these samples.

17) The following shipments of assembled cassettes were received by B.A.S.F. from Holiday under Purchase Order No. 20080 on the following dates and never were rejected:

| | |
|---|---|
| July 17, 1970 | 37,600 |
| July 31, 1970 | 44,600 |
| August 17, 1970 | 60,000 |
| August 26, 1970 | 172,600 |

18) On September 23, 1970, B.A.S.F. received a shipment of three hundred twenty-thousand cassettes from Holiday under Purchase Order No. 20080.

19) On September 29, 1970, an inter-office memo from B.A.S.F. indicated problems had been discovered with the Holiday cassette, some of which were felt not attributable to Holiday. Those for which Holiday was felt to be at fault were: flash (seepage of welding material), rough finish, improper color and scratches on the cassettes, discoloration of parts and nicks in the mold. This information was communicated to Holiday on October 5, 1970.

20) On September 30, 1970, inter-office correspondence indicates that B.A.S.F. was considering use of screw-fastened cassettes. Mr. E. Fuller of B.A.S.F. recommended use of the current Holiday cassette mold with modifications to permit screw assembly.

21) On October 1, 1970, B.A.S.F. gave Holiday a purchase order to modify a four-cavity lock out ring mold (a mold unrelated to the cassette program production).

22) On October 15, 1970, B.A.S.F. discovered that it was receiving from Holiday cassettes outside the maximum length and width dimensions, and notified Holiday, sending measurements taken on five cassettes.

23) On October 16, 1970, B.A.S.F. notified Holiday to stop delivery of cassettes, but earlier in the day Holiday had already shipped three hundred sixty-one thousand eight hundred under Purchase Order No. 20080. On October 22, 1970, B.A.S.F. tested the October 16 shipment of three hundred sixty-one thousand eight hundred and found it to contain cassettes outside the maximum width. This shipment was rejected by B.A.S.F. on October 30.

24) On October 23, 1970, B.A.S.F. notified Holiday to stop production immediately.

25) On October 30, 1970, B.A.S.F. tested the September 23 shipment of three hundred twenty thousand and found the cassettes therein to be outside

the maximum length and width dimensions due to excessive welding material. B.A.S.F. rejected this shipment on November 4, 1970. Throughout November and early December of 1970, Holiday attempted to correct the oversize problem and sent B.A.S.F. sample cassettes for approval.

26) On November 1, 1970, Mr. E. Maschka, formerly of B.A.S.F., was employed by Holiday and placed in charge of production. On November 27, Mr. Maschka requested from B.A.S.F. a copy of I.M.S.–A–100 Revision 5, which had been compiled by B.A.S.F. on November 18 as the current standards for determining cassette acceptability. There is no direct evidence that I.M.S.–A–100 Revision 5 was ever sent to Holiday, but the Court concludes from the actions of the parties that this I.M.S. was made available to Holiday soon after it was requested. This I.M.S. did not contain revised outside dimensions for the cassettes, but it did contain the requirement that: "The leader must. be completely around the inside of the hub leader clamping slot and be flush to one eighth inches above the hub winding surface." The leader is a piece of tape which Holiday was to attach to the cassette hub and to which the blank recording tape would be attached by B.A.S.F. at its own plant.

27) On December 10, 1970, B.A.S.F. telegraphed Holiday new cassette outside dimensions which gave tolerances expanded beyond those previously issued.

28) On January 6, 1971, B.A.S.F. received twenty thousand assembled cassettes from Holiday under Purchase Order No. 20080, for which B.A.S.F. telegraphed acceptance on January 8. This telegram called Holiday's attention to the fact that the leader should be flush to one-eighth inch above the hub-winding surface.

29) During January of 1971, additional assembled cassettes were received by B.A.S.F. from Holiday under Purchase Order No. 20080 as follows:

| | |
|---|---|
| January 13, 1971 | 74,600 |
| January 21, 1971 | 48,000 |
| January 21, 1971 | 65,000 |

30) On January 20, B.A.S.F. tested the January 13 shipment of seventy-four thousand six hundred and found that it did not conform to the leader alignment specifications. B.A.S.F. notified plaintiff of this on January 26 with the statement that due to production requirements, B.A.S.F. would use these cassettes, but that Holiday was requested to correct the problem.

31) On February 1, 1971, the January 21 shipment of forty-eight thousand was tested by B.A.S.F. and the same leader problem was found. B.A.S.F. notified Holiday of this on February 4, stating that due to production requirements B.A.S.F. would accept this lot but would not do so in the future. On February 5, Holiday wrote B.A.S.F. denying that there was a leader problem.

32) In February of 1971, B.A.S.F. received assembled cassettes from Holiday under Purchase Order No. 20080 as follows:

| | |
|---|---|
| February 8, 1971 | 100,000 |
| February 23, 1971 | 128,000 |

33) On February 18, 1971, B.A.S.F. placed Purchase Order No. 24469 with Holiday for seventy-five thousand cassettes with no knock-out tabs. All previous cassette shipments had been under the original Purchase Order No. 20080. The Purchase Order No. 24469 cassettes were identical to the previous cassettes in all respects except one, that is, there were no knock-out tabs. The price was also $.14144 per cassette.

34) On March 2, 1971, B.A.S.F. received ninety-one thousand four hundred cassettes under Purchase Order No. 20080 from Holiday. These were tested by B.A.S.F. on March 3 and found to have the same leader problem. B.A.S.F. notified Holiday of this defect on March 9, stating that B.A.S.F. accepted this shipment but would refuse further shipments with this defect. Also on March 9, B.A.S.F. placed with Holiday Purchase Order No. 24790 for fifty thousand cassettes with no knock-out tabs at $.1414. per cassette.

35) In March of 1971, cassette shipments from Holiday were received by B.A.S.F. as follows:

| | | |
|---|---|---|
| March 10, 1971 | 16,000 | Purchase Order 20080 |
| March 10, 1971 | 21,000 | Purchase Order 24469 |
| March 12, 1971 | 16,000 | Purchase Order 24790 |
| March 16, 1971 | 23,000 | Purchase Order 24469 |

36) On March 15, B.A.S.F. tested the March 10 shipment under Purchase Order No. 20080 and found it to contain cassettes with two defects:

a) The guide hole measurements were less than the specified minimum (guide holes are two matched holes located in the raised portion of the face of the cassette and their function is to receive the pins of the cassette player and hold the cassette in place while the tape is playing).

b) The width of the cassettes exceeded the maximum dimension.

37) On March 16, B.A.S.F. tested four more lots of cassettes, including those previously received in March as well as some from B.A.S.F.'s inventory, for which the date of receipt is impossible to determine. The guide hole defect was found in all four lots, and the overwidth defect was found in one lot.

38) On March 17, 1971, B.A.S.F. notified Holiday of these test results and stated that it was rejecting its entire inventory of Holiday cassettes.

39) Also on March 17, 1971, Holiday shipped B.A.S.F. cassettes as follows:

| | |
|---|---|
| 111,400 | Purchase Order 20080 |
| 10,000 | Purchase Order 24469 |
| 23,400 | Purchase Order 24469 |

40) On March 19 and 24, B.A.S.F. tested the shipments of March 17 and found the guide hole size defect in all three shipments and the width defect in the largest shipment.

41) On March 29, 1971, B.A.S.F. notified Holiday the three shipments of March 17 were rejected because of the guide hole and width defects.

42) On April 5, 1971, B.A.S.F. notified Holiday it was cancelling Purchase Order Nos. 20080, 24469 and 24790 due to "continuous quality problems and delivery delays."

## DISCUSSION

Neither party disputes that the Uniform Commercial Code governs this suit.[1]

Section 2–612 of the U.C.C. states as follows:

2.612. *Installment contract; breach.*

(1) An "installment contract" is one which requires or authorizes the delivery of goods in separate lots to be separately accepted, even though the contract contains a clause "each delivery is a separate contract" or its equivalent.

(2) The buyer may reject any installment which is nonconforming if the nonconformity substantially impairs the value of that installment and cannot be cured or if the nonconformity is a defect in the required documents; but if the nonconformity does not fall within subsection (3) and the seller gives adequate assurance of its cure the buyer must accept that installment.

(3) Whenever nonconformity or default with respect to one or more installments substantially impairs the value of the whole contract there is a breach of the whole. But the aggrieved party reinstates the contract if he accepts a nonconforming installment without seasonably notifying of cancellation or if he brings an action with respect only to past installments or demands performance as to future installments.

The Court finds that cassette Purchase Order No. 20080 constituted the contract of manufacture and sale between Holiday and B.A.S.F. for six million cassettes at $.14144 per cassette

1. On the back of each purchase order (supplied by B.A.S.F.) is a statement that it is to be governed by the law of Massachusetts. However, the Court is aware of no differences between the laws of Massachusetts and Nebraska which are relevant to this suit and will rely for its decision on principles generally applicable under the U.C.C.

with delivery to begin in April of 1970 at five hundred thousand cassettes per month until completed. This was an installment contract under Section 2–612(1). The Court further finds that this was not a contract in which all of the terms were agreed upon at the time of the contract's formation, but one in which the basic terms were reached and later refinements concerning what would constitute acceptable cassettes were expected.

In determining whether B.A.S.F. acted lawfully or unlawfully in cancelling the purchase orders, Section 2–612(3) governs, and gives B.A.S.F. a right to cancel if the "nonconformity or defect with respect to one or more installments substantially impairs the value of the whole contract" for B.A.S.F.

■ The fact that the cassettes produced by Holiday did not conform to the contract is not seriously in doubt. Virtually all of the evidence with respect to tests performed on various shipments from Holiday was introduced by B.A.S.F., and the Court finds that in many areas the Holiday cassettes were not in accordance with the contract. However, proof of nonconformity is only a part of the showing which B.A.S.F. must make in order to justify its cancellation of the contract. B.A.S.F. must also show that the nonconformities substantially impaired the value of the whole contract for B.A.S.F. As to what constitutes substantial impairment of the value of the contract, authority is scarce. Comment 6 to Section 2–612 addresses the problem but provides little practical assistance:

> Whether the non-conformity in any given installment justifies cancellation as to the future depends, not on whether such non-conformity indicates an intent or likelihood that the future deliveries will also be defective, but whether the non-conformity substantially impairs the value of the whole contract. If only the seller's security in regard to future installments is impaired, he has the right to demand adequate assurances of proper future

performance but has not an immediate right to cancel the entire contract. It is clear under this article, however, that defects in prior installments are cumulative in effect, so that acceptance does not wash out the defect "waived." Prior policy is continued, putting the rule as to buyer's default on the same footing as that in regard to seller's default.

The question is essentially one of fact and must turn upon the particular circumstances in this case. Therefore, the Court turns to an examination of the reasons given by B.A.S.F. in its cancellation telegram of April 5, 1971, which were: "continuous quality problems and delivery delays."

## DELIVERY DELAYS

■ There is no question that Holiday's cassette manufacturing project was behind schedule from the start, and that at no point during the existence of the contract was Holiday delivering five hundred thousand cassettes per month. However, nowhere in either the correspondence between Holiday and B.A.S.F. or the inter-office correspondence of B.A.S.F. introduced at trial is there any indication whatsoever that B.A.S.F. was seriously concerned with Holiday's delivery delays. To the contrary, the evidence shows that B.A.S.F.'s chief concern was production of an acceptable cassette and that B.A.S.F. was quite willing to give Holiday ample time to do this. B.A.S.F. sent official representatives to the Holiday plant frequently, throughout the existence of the contract, in order to help Holiday bring its cassette production up to B.A.S.F.'s standards. The Court concludes that B.A.S.F.'s use of the Holiday sonic-welded cassette was a potentially very profitable business venture and that the delays which occurred in development of this relatively new product by a manufacturer unfamiliar with cassette production were liberally tolerated by B.A.S.F. Certainly B.A.S.F. cannot be allowed to pursue this course of conduct concerning Holiday's failure to perform the contract on time, and then be permitted to urge

this non-performance as a justification for cancelling the contract.

## CONTINUOUS QUALITY PROBLEMS

The evidence discloses and the Court finds that there were five occasions[2] during the Holiday-B.A.S.F. contract on which significant defects existed in the cassettes manufactured by Holiday for B.A.S.F. under Purchase Order No. 20080:

1) "Sink" on the cassette surface

a) Reported: mid-April, 1970; June 4, 1970

b) Corrected: No later than June 22, 1970, the date on which the Court finds B.A.S.F. accepted the cassette then being produced by Holiday.

2) Cracks in the knock-out tabs; overweld around the periphery of the cassette

a) Reported: June 30, 1970

b) Corrected: No later than July 17, 1970, the date on which the next shipment of acceptable cassettes was received by B.A.S.F.

3) Oversize cassettes in both length and width

a) Reported: October 16, 1970; October 30, 1970

b) Corrected: No later than January 6, 1970, the date on which the next shipment of acceptable cassettes was received by B.A.S.F.

4) Leader not attached flush to one-eighth inch above the hub-winding surface

a) Reported: January 8, 1971; January 26, 1971; February 4, 1971; March 9, 1971

b) Corrected: The only evidence this defect existed after March 9, 1971, is in the results of a test conducted by B.A.S.F. on March 16, 1971, on a shipment of twenty-one thousand cassettes under Purchase Order No. 24469, where the defect was observed at a rate of less than one per cent, which is within the acceptable quality level of 2.5 per cent for major defects under the MIL–STD Sampling Plan. The Court, therefore, concludes that this defect was no longer significant as of March 10, 1971, the date on which the shipment tested on March 16 was received.

5) Guidehole spacing less than required minimum; cassettes oversize in width

a) Reported: March 17, 1971

b) Corrected: No correction was made; the contracts were cancelled by B.A.S.F. on April 5, 1971.

■ Considering only the information listed in these five paragraphs, the issue of whether these five occasions substantially impaired the value of the cassette contract to B.A.S.F. is a close one. For example, on three occasions the defects were not corrected for approximately two months. Moreover, one of the defects discovered in the tests conducted by B.A.S.F. in mid-March of 1971 had occurred previously—*i. e.,* overwidth of the cassettes. But the Court cannot look at these factors alone; it must consider all of the evidence introduced at trial. And when all of this evidence is considered, the Court is of the opinion that B.A.S.F. was not justified in cancelling the contract.

First, concerning the instances in which over two months were required for Holiday to correct defects, as discussed previously, the Court finds that B.A.S.F. evidenced no protest or even serious displeasure concerning these delays.

Second, although the overwidth problem had been noted once earlier,[3] this is

2. In addition to these five occasions, there were other instances in which B.A.S.F. notified Holiday of present or potential problems with the cassettes, but the Court finds from all the evidence that the defects complained of in these instances were not of such a nature as to be significant deviations from the required standards.

3. Perhaps it could be argued that the overwidth problem was caused by overweld around the cassette periphery, a defect not-

the only repetition of any significant defect. The situation here is far different from that in Sunray D–X Oil Co. v. Great Lakes Carbon Corp., 476 P.2d 329 (Okl.1970), cited by B.A.S.F. where the plaintiff-seller delivered goods which were consistently defective *for the same reason* for almost nine months prior to cancellation of the contract by the defendant-buyer, who had repeatedly notified the seller of the defect.

Third, and what is most persuasive to the Court, on February 16, 1971, and March 9, 1971, B.A.S.F. placed with Holiday purchase orders (Nos. 24469 and 24790) for cassettes *identical* to the cassettes under the original purchase order (No. 20080) in all respects except for the fact that they had no knock-out tabs, a feature having no connection whatsoever with any of the defects later discovered. Certainly these actions by B.A.S.F. must be construed to mean that at the time the purchase orders were given, B.A.S.F. had confidence that Holiday could produce acceptable cassettes. The only significant defects reported after this time were the guide hole spacing and the overwidth,[4] of which the former was clearly of greater proportions.

Section 2–612(3) of the U.C.C., of course, does not contain a requirement, that the non-conformity cannot be cured, such as is contained in Section 2–612(2). But, in evaluating the contract from B.A.S.F.'s position on April 5, 1971 (after B.A.S.F. had ordered almost identical cassettes within the previous six weeks), the Court concludes that the apparent lack of concern by B.A.S.F. over delivery delays and the ability of Holiday to cure defects generally in the past, are evidence that the non-conformities discovered in the mid-March tests did not substantially impair the value of the contract to B.A.S.F.

B.A.S.F. urges that the case of Graulich Caterer, Inc. v. Hans Holterbosch, Inc. 101 N.J.Super. 61, 243 A.2d 253, 5 U.C.C.Rep. 440 (1968), compels a contrary result. However, in that case the subject of the installment contract was prepared food for delivery to the buyer's pavilion at the World's Fair. There the Court held that after the second day of delivery of nonconforming goods, the buyer was justified in cancelling the contract. The urgent need for food of an acceptable quality in *Graulich* is easily distinguishable from the production of cassettes, the delay in manufacture of which was never objected to by B.A.S.F.

B.A.S.F. emphasized stongly at trial the fact that there was a grossly inadequate quality assurance (Q.A.) program at the Holiday plant. The Court finds that although B.A.S.F. repeatedly recommended a detailed Q.A. plan to Holiday, Holiday implemented a plan slowly and did not keep records sufficient to show conscientious operation of the plan. However, this failure of Holiday would only be material if the cassette defects were in dispute, or the evidence tended to show that the same defects recurred frequently. But the evidence is strongly to the contrary on both points.

B.A.S.F. also argues in its brief that credit memos issued by Holiday to B.A.

ed on the second occasion above. However, the Court finds that there is insufficient evidence to establish causation of the overwidth.

4. On one of the test results in evidence, the defendant's exhibit 69, dated March 16, 1971, and performed on a lot of twenty-one thousand cassettes under Purchase Order No. 24469, the leader problem first noted on January 8, 1971, was noted again at a rate of less than one per cent; stretched leaders were noted at less than five per cent; and it was noted that cassettes broke when dropped from a height of three feet, at less than five per cent. There is no evidence, however, indicating whether the latter two of these were major or minor defects as previously defined in I.M.S.–A–100 Revision 5. The Court concludes that they were minor, and that by this I.M.S. the per cent defective for both defects did not give cause for rejection. Also, by this I.M.S., the Court concludes that even though the leader alignment problem was major, a rejection rate of less than one per cent would be acceptable.

S.F. on August 8, 1970, and December 29, 1970, for cassette shipments have some bearing on B.A.S.F.'s justification for cancelling the contract. However, if the credit memos are material at all, it would only be to show that Holiday acknowledged delivery of defective goods for the cassettes represented by these credit balances, an issue which is not in dispute.

## HOLIDAY'S DAMAGES

■ The amount of damages to be awarded Holiday because of the wrongful breach of the contract by B.A.S.F. is also governed by the U.C.C. These damages fall within two categories:

a) The amount based on the number of cassettes produced by Holiday under the contract;

b) The amount based on the portion of the contract for which no cassettes were produced.

■ The evidence introduced at trial does not disclose any records or method of computation which would enable the Court to determine the exact number of cassettes produced by Holiday for B.A. S.F. under the cassette contract. The Court concludes from all the evidence that the closest possible determination is that one and a half million cassettes were produced by Holiday for B.A.S.F. under Purchase Order No. 20080 (no damages are claimed by Holiday under either of the later cassette purchase orders). With respect to these, the measure of damages is specified in Section 2-706(1) of the U.C.C. to be the contract price less any amounts received on resale of the goods. For these one and a half million cassettes, the contract price was $.14144 per cassette, or $212,160.00. The Court finds that the resale of the goods by Holiday was made in good faith and in a commercially reasonable manner and produced $123,967.12, re-

sulting in a balance due Holiday of $88,192.88.

For the 4.5 million cassettes required by the contract but production of which was prevented by B.A.S.F.'s wrongful cancellation, the measure of damages is specified by Section 2-708(2) of the U. C.C. to be the profit which Holiday would have made if the contract had been completed. The Court finds that the contract price per cassette was $.14144 and the cost to Holiday of production per cassette was $.13045, resulting in a profit of $.0109 per cassette. The total profit on four and a half million cassettes would have been $49,455.00. Thus, the total amount due Holiday for both the completed and uncompleted portions of the cassette contract is $137,647.88.

From this total must be subtracted any amounts paid Holiday by B.A.S.F. on the cassette contract. Proof of this amount is embodied in plaintiff's Exhibit 98, from which the Court finds that the total amount paid Holiday by B.A.S. F. is $108,494.32. It is not perfectly clear from this exhibit whether this figure includes the $17,000.00 paid Holiday for the eight-cavity cassette mold, which was to remain the property of B.A.S.F., but which has not been returned to B. A.S.F. by Holiday. The Court finds from all the evidence that plaintiff's Exhibit 98 does include the $17,000.00 paid by B.A.S.F. for the cassette mold. However, it is unnecessary to deduct this amount from the $108,494.32 since B.A. S.F. is entitled to the mold now in Holiday's possession, for which the Court finds the fair market value to be $17,000.00.

Therefore, the final amount due Holiday from B.A.S.F. is $137,647.88, less $108,494.32, which is $29,153.56. A separate order will be entered this day rendering judgment in accordance with this opinion.