**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**NOV 16 2000**

**PATRICK FISHER**
**Clerk**

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

L & M ENTERPRISES, INC.,

      Plaintiff - Appellant,

v.

BEI SENSORS & SYSTEMS
COMPANY, Edcliff Instruments
Division,

      Defendant - Appellee.

No. 99-3146

---

Appeal from the United States District Court
for the District of Kansas
(D.C. No. 98-CV-1100)

---

Christopher W. O'Brien of Robbins, Tinker, Smith & Tinker, Wichita, Kansas, for
Plaintiff-Appellant.

Ronald K. Badger, Wichita, Kansas (Vince P. Wheeler of Kahrs, Nelson, Fanning,
Hite & Kellogg, Wichita, Kansas, with him on the brief) for Defendant-Appellee.

---

Before **BALDOCK**, **MAGILL**[*] and **LUCERO**, Circuit Judges.

---

**LUCERO**, Circuit Judge.

---

    [*] The Honorable Frank J. Magill, Senior Circuit Judge, United States Court
of Appeals for the Eighth Circuit, sitting by designation.

This case arises out of the termination of an exclusive distribution agreement between defendant-appellee BEI Sensors & Systems Company ("BEI") and plaintiff-appellant L & M Enterprises, Inc. ("L & M"). L & M appeals the district court's grant of summary judgment for BEI on claims under Kansas law for breach of contract, as well as tortious interference with a contract and prospective business advantage. Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we affirm.

**I**

The facts of this case for summary judgment purposes, as found by the district court, are set forth in L & M Enterprises, Inc. v. BEI Sensors & Systems Co., 45 F. Supp. 2d 879, 881-85 (D. Kan. 1999), and, because the parties do not take issue with the district court's findings, we do not repeat those facts in detail here. BEI manufactures, and L & M distributes, aircraft-related items. In September 1994, the parties entered into an agreement naming L & M as the exclusive distributor of two BEI-produced repair kits for certain flight instruments. The agreement itself contained no payment terms; however, L & M initially submitted purchase orders providing for payment "net 30," whereas BEI submitted invoices initially providing for payment "net 30" but later "net 45." Id. at 882. Beginning in 1995, BEI became concerned with L & M's non-payment of bills, although the parties dispute the exact timing and nature of the

communications regarding late payments. In particular, L & M contends that BEI shipped kits ahead of schedule to meet financial goals and, in return, agreed to accept payment when L & M sold the kits, rather than under the invoice terms. It is undisputed, however, that by October 31, 1995, L & M owed BEI more than $400,000, over $200,000 of which was from accounts at least 91 days past shipping.

In early November 1995, the parties reached an agreement regarding L & M's payments of the past due amounts, as well as payment for future shipments. BEI claims these future shipments were to be paid within forty-five days; L & M asserts there was oral discussion of a sixty-day time frame. L & M's only citation to the record on this point is to the district court's order rejecting its claim that "60 days had been mentioned during the parties' negotiations." (Appellant's Br. at 8 (citing Appellant's App. at 309)    .) Our review of the record indicates that both L & M's treasurer, Larry Widmer, and L & M's president, Bill Lewis, testified that they were unsure whether the November 1995 agreement had been for a forty-five or a sixty-day payment period. In contrast to these uncertain recollections, the district court noted that "L & M's purchase orders submitted after the parties' November 1995 agreement reflect that payment was due 'net 30.' And, BEI's invoices indicate payment was due 'net 45.'" L & M Enters. , 45 F. Supp. 2d at 882-83. L & M does not dispute

- 3 -

these findings. Because neither party's behavior subsequent to the November 1995 agreement comports with a sixty-day payment term, we agree with the district court that L & M has failed to raise a material dispute as to the "Net 45 Days" term established by BEI's invoices.

In late December 1995 and mid-January 1996, BEI shipped fifty-five kits to L & M. None of the total due was paid within forty-five days of shipment and over half was still outstanding after sixty days. L & M argues that because the kits were shipped ahead of its requested shipping date, it was not required to make payment until it received payment from its customer. Again, however, L & M fails to identify in its brief the portion of the record allegedly supporting this claim. Review of the record reveals that L & M relies on the testimony of L & M President Lewis. Lewis's testimony on this point was "[w]hen early shipments were received most of the time they were received in pretty much open ended terms. . . . [T]he invoices were due and payable at some time after those parts shipped to our customer." (Appellant's App. at 175.) However, further review of Lewis's testimony suggests that it refers to "Cessna parts," ( id.), "which were not subject to the Distribution Agreement at issue," L & M Enters. , 45 F. Supp. 2d at 882 n.1. The relevance of this vague testimony as to an alleged, apparently oral, agreement for "open ended" payment terms is undermined both by the uncontroverted written payment terms of the invoices

and by Lewis's own testimony. At his deposition, Lewis agreed that the relevant November 1995 agreement obligated L & M to pay within a _definite_ time period that started running on the date of the BEI invoice. L & M thus fails to establish a dispute of material fact as to the payment terms for early shipments after the November 1995 agreement.

One of L & M's customers was Tesco, which needed BEI kits for a government contract. In early February 1996, an L & M representative contacted BEI's marketing director, Albert Hazan, regarding an order Tesco placed in mid-January. According to L & M, Hazan stated he would not ship the kits unless L & M agreed to pay $300 above the previously agreed upon price. Ralph Challoner, Tesco's director of business operations, called L & M to ask why the kits Tesco ordered were not being delivered. Challoner was told BEI was not sending L & M kits due to problems at BEI. Challoner then called BEI directly and was led to believe BEI was trying to work with L & M to resolve BEI's and L & M's difficulties, not that BEI was terminating L & M as a distributor. After Challoner's call to BEI in February 1996, a BEI representative called Lewis and Larry Widmer of L & M, proposing that BEI sell the parts directly to Tesco and pay the commission or work out the difference with L & M. Id. L & M claims it never authorized BEI to sell the kits to Tesco outside the Distribution Agreement.

L & M contends that Challoner again spoke by telephone with BEI's Hazan in mid-February 1996 and that during this conversation Hazan stated that BEI would "fulfill any and all [of Tesco's] requirements."     Id. at 884.  BEI claims it did not solicit Tesco's business.     However, on February 22, 1996, Tesco issued a purchase order directly to BEI for twenty kits, which were shipped the next day.

At some point in early 1996, L & M's attorney prepared a "Memorandum of Understanding Between BEI and L & M Enterprises, Inc." that was different from the November 1995 agreement.     Id.  The 1996 memorandum stated that BEI and L & M were seeking to maintain their business relationship, provided for payment of amounts due to BEI with personal guarantees from "L & M Management," and indicated that a new Distribution Agreement would be negotiated.   Id.  An "Agreement to Repay Debt" and a "Guaranty Agreement for Payment Under Agreement to Repay Debt" were prepared and a new "Distribution Agreement" was negotiated, all of which L & M faxed to BEI on March 12, 1996.   Id.  L & M officers had signed the Agreement to Repay Debt and the Distribution Agreement, but one L & M officer had not signed the Guaranty.   On March 14, 1996, another Guaranty, which included all necessary signatures, was prepared but never sent to BEI.     That same day, L & M sent a letter to BEI stating that the documents faxed to BEI on March 12, 1996, were withdrawn and of no "further force and effect."     Id.  L & M claims its change of

- 6 -

heart was due to its discovery that BEI had shipped items directly to Tesco in violation of the Distribution Agreement.

After receiving the letter, BEI decided to discontinue doing business with L & M and, on April 3, 1996, sent L & M a "Notice of Cancellation" canceling the 1994 Distribution Agreement for failing to pay amounts due and a "Notice of Termination" terminating the 1994 Distribution Agreement, effective 120 days from the date of the notice.    Id.

## II

"We review[] the grant or denial of summary judgment de novo, applying the same legal standard used by the district court."    Kaul v. Stephan  , 83 F.3d 1208, 1212 (10th Cir. 1996) (citation omitted).  That standard is set forth in Fed. R. Civ. P. 56(c):  Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  In reviewing a summary judgment motion, the court is to view the record "in the light most favorable to the nonmoving party."    Thournir v. Meyer  , 909 F.2d 408, 409 (10th Cir. 1990) (citation omitted).  The purpose of a summary judgment motion, unlike that of a motion to dismiss, is to determine whether there is evidence to support a party's factual claims.  Unsupported conclusory allegations thus do not

create a genuine issue of fact. See United States v. Simons, 129 F.3d 1386, 1388-89 (10th Cir. 1997) (citing Allen v. Muskogee, Okla., 119 F.3d 837, 843-44 (10th Cir. 1997)). To withstand summary judgment, the nonmoving party "must come forward with 'specific facts showing that there is a genuine issue for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)).

### III

Kansas Stat. Ann. § 84-2-703(f) provides that "[w]here the buyer . . . fails to make a payment due on or before delivery[,] . . . then with respect to any goods directly affected and, if the breach is of the whole contract[,] . . . then also with respect to the whole undelivered balance, the aggrieved seller may . . . cancel." Unlike termination under U.C.C. § 2-309, cancellation under § 2-703(f) for failure to pay does not require prior notice to a buyer. See, e.g., Heating & Air Specialists, Inc. v. Jones, 180 F.3d 923, 933 (8th Cir. 1999); International Therapeutics, Inc. v. McGraw-Edison Co., 721 F.2d 488, 492 (5th Cir. 1983).

The district court ruled that L & M's breach of the distribution agreement by failure to make timely payments justified BEI's cancellation of the agreement under Kan. Stat. Ann. § 84-2-703(f). See L & M Enters., 45 F. Supp. 2d at 885. Although L & M concedes that the UCC allows for contract cancellation for failure to make payment, it argues that additional facts apart from this failure

- 8 -

make the issue of whether cancellation is justified a disputed issue of fact. Specifically, it points to "evidence concerning BEI & L & M's agreements to keep the contract in place, L & M's payments after default, BEI's acceptance of payments, and BEI's breach of the contract in February and March of 1996." (Appellant's Br. at 16.)

L & M's citation to Bill's Coal Co. v. Board of Pub. Utils., 887 F.2d 242, 247 (10th Cir. 1989), in support of its argument is unpersuasive. In Bill's Coal Co., we stated that "the question of 'substantial impairment' under [U.C.C. § 2-612] presents a question of fact." Id. (citations omitted). We agree that Kan. Stat. Ann. § 84-2-703 would appear to require substantial impairment under § 2-612(3) to establish breach of the whole contract and therefore justify cancellation of the contract as to the undelivered balance. Bill's Coal Co., however, involved a factual question of whether non-conforming coal shipments substantially impaired the value of the contract. See 887 F.2d at 247-48. In the instant case, L & M completely failed to make timely payments. We agree with the courts that have held implicitly that an undisputed failure to pay for shipments establishes, as a matter of law, substantial impairment justifying cancellation as to the future undelivered balance of a contract. See, e.g., Heating & Air Specialists, 180 F.3d at 933-34; Frigiking, Inc. v. Century Tire & Sales Co., 452 F. Supp. 935, 938 (N.D. Tex. 1978).

L & M argues that Frigiking is distinguishable from this case because of L & M's allegations of BEI's breach, efforts to reduce the debt, and a repayment agreement. These distinctions do not persuade us of the existence of a material dispute as to justification for cancellation. We fail to see how BEI's alleged breaches of the contract in February and March 1996 are material to the question of its justification for cancellation, a justification which arose prior to those alleged breaches. As of February 12, 1996, L & M was already overdue as to payments under the November 1995 agreement.

## IV

The district court concluded L & M's claims for tortious interference with a contract and prospective business advantage require proof of malice under Kansas law. See L & M Enters., 45 F. Supp. 2d at 887 ("Both tortious interference with a contract and tortious interference with contractual expectations or a prospective business advantage are predicated on malicious conduct by the defendant." (quoting Turner v. Halliburton Co., 722 P.2d 1106 (Kan. 1986))). L & M disputes the district court's interpretation of Kansas law and cites DP-Tek Inc. v. AT & T Global Information Co., 891 F. Supp. 1510 (D. Kan. 1995), for the proposition that a plaintiff only needs to show malice when a tortious interference claim is based upon defamation. Discussing the elements of tortious interference under Kansas law, a footnote in DP-Tek states:

> This court does not believe that the Turner case supports an interpretation that actual malice is required for a finding of wrongful conduct sufficient to support a tortious interference claim. While the Turner case does discuss an actual malice standard, that is only because the plaintiff's tortious interference claim was based upon alleged defamatory statements . . . .

Id. at 1520 n.14.

We disagree with DP-Tek's interpretation of Kansas law. The Kansas Supreme Court has applied the Turner malice requirement in a tortious interference case not involving defamation. See Dickens v. Snodgrass Dunlap & Co., 872 P.2d 252, 257 (Kan. 1994) ("Tortious interference with a contract is predicated on malicious conduct by the defendant." (citing Turner, 722 P.2d at 1106)). Dickens thus clearly indicates that malice is a predicate for tortious interference and is not limited to cases involving allegations of defamatory conduct. We follow the pronouncement of the state's highest court rather than a distinction urged in a federal district court footnote.

L & M does not point to specific facts showing malicious conduct by BEI, instead basing this appeal on the argument that malice is not an element of tortious interference claims. L & M's failure to prevail on this point of law thus ends its case as to its tort claims.

## V

The judgment is **AFFIRMED**. The mandate shall issue forthwith.

- 11 -