**Geraldine RICHARDSON, Plaintiff,**

v.

**BLUE CROSS/BLUE SHIELD OF KANSAS, INC., Defendant.**

**No. 00–4038–SAC.**

United States District Court,
D. Kansas.

April 15, 2002.

Pantaleon Florez, Jr., Florez & Frost, P.A., Topeka, KS, for plaintiff.

Jane Chandler Holt, Alan L. Rupe, Dwight David Fischer, Blue Cross and Blue Shield of Kansas, Inc., Topeka, KS,

Georgina R. Adami, Husch & Eppenberger, LLC, Wichita, KS, for defendant.

## MEMORANDUM AND ORDER

CROW, Senior District Judge.

In this case, plaintiff Geraldine Richardson alleges that defendant Blue Cross/Blue Shield of Kansas, Inc. ("Blue Cross") discriminated against her on the basis of her race, African American, and constructively discharged her. The case comes before the court on defendant's motion for summary judgment.

## SUMMARY JUDGMENT STANDARD

More than a "disfavored procedural shortcut," summary judgment is an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.'  Fed.R.Civ.P. 1." *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265(1986).  At the same time, a summary judgment motion does not empower a court to act as the jury and determine witness credibility, weigh the evidence, or choose between competing inferences. *Windon Third Oil and Gas Drilling Partnership v. Federal Deposit Ins. Corp.*, 805 F.2d 342, 346 (10th Cir. 1986), *cert. denied*, 480 U.S. 947, 107 S.Ct. 1605, 94 L.Ed.2d 791(1987).

Under this standard, this court examines the record to determine whether any genuine issue of material fact is in dispute, construing the factual record and reasonable inferences therefrom in the light most favorable to the nonmoving party. *See Curtis v. Oklahoma City Pub. Schs. Bd. of Educ.*, 147 F.3d 1200, 1214 (10th Cir.1998). When the nonmovant will bear the burden of proof at trial, he can survive summary judgment only by going beyond the pleadings and presenting evidence sufficient to establish the existence, as a triable issue, any essential and contested element of his case. *See McKnight v. Kimberly Clark Corp.*, 149 F.3d 1125, 1128 (10th Cir.1998).

A party opposing a motion for summary judgment must set forth "specific facts" to defeat the motion, Fed.R.Civ.P. 56(e). "Unsupported conclusory allegations ... do not create a genuine issue of fact." *L & M Enters., Inc. v. BEI Sensors & Sys. Co.*, 231 F.3d 1284, 1287 (10th Cir.2000).

## FACTS

1.   Plaintiff was hired by Blue Cross on October 13, 1997 as a Data Match correspondent in Blue Cross's Medicare Department of Government Programs.

2.   The "job summary" for the Data Match correspondent, the position for which Plaintiff was training, states in part that plaintiff was to:

> Request and process refunds or additional payments in compliance with Health Care Finance Administration (HCFA) regulations for the Data Match project and MSP. Coordinate benefits with other insurance companies, providers, [etc] Handle all aspects of MSP files to include answering all written and telephone inquiries relating to Data Match occurrence and MSP refunds.

3.   Plaintiff's employment with Blue Cross was "at-will."  Plaintiff understood this from the time she was hired.

4.   Plaintiff remained in training for this position until her employment terminated on May 8, 1998.

5.   Plaintiff received training with three other Data Match correspondent trainees, all of whom were Caucasian: Jaclyn Sell, Cris Pulatie, and Jeanette Wegele.

6.   Plaintiff received the same classroom training as did the three other correspondent trainees.  While in the classroom, the trainees received instruction on the same topics at the same time and were given the same worksheets.

7.   Blue Cross monitored the work and quality of all Data Match correspondents.

8. The work of the trainees was required to be graded in a uniform manner. The person who checked the quality of the trainees' work was to have no discretion when determining which errors will be counted against a trainee. Instead, that person was expected to follow a standard prepared list of quality items, which indicated what was considered an error and whether that error was critical or non-critical.

9. Trainees could earn back points by making timely corrections. If a trainee failed to do so, the errors were counted against the trainee according to fixed criteria.

10. The training period, referred to as "the graph," was to last up to sixteen (16) weeks.

11. During the graph, trainees were graded on accuracy, production, and completion. The trainees were required to receive predetermined percentages in each of these areas, each week. The percentage required increased throughout the sixteen week graph.

12. These percentages were in place prior to plaintiff's employment and applied to all trainees, regardless of race.

13. If, at the end of a week of training, a trainee failed to meet the required percentage for one or more of the categories, the trainee was required to repeat that week's work.

14. The work assigned to trainees was kept in a file cabinet with the oldest work placed in the front of the cabinet drawer. Some "batches" of work may have contained more difficult assignments than other "batches," but the work was not organized in this, or any other particular manner.

15. The work was assigned by "luck of the draw." Blue Cross has no method in place by which to compare the level of difficulty of assignments given to various trainees.

16. During the relevant time period, plaintiff was supervised by Susan Bowman. Mr. Pat Mulligan managed the department and was Bowman's supervisor.

17. Tracey Kramer performed quality check on the trainees until she left for maternity leave on December 16, 1997, at which time Shirley Wooten and Joni Lippert began checking quality on alternating weeks.

18. In April of 1998, Wooten became the Assistant Supervisor and was then responsible for answering trainees' questions.

19. Trainees were given approximately twenty minutes of "question time" per day, during which they could ask work-related questions. Supervisors tried to provide the full twenty minutes per day, but urgency of workload sometimes prevented this. If the workload required, the twenty minute question period would be moved to another day or would be shortened. This happened to all trainees at times.

20. At the time plaintiff's employment with Blue Cross terminated, she had completed 11 weeks of the sixteen-week training program.

21. During her employment, plaintiff's overall performance was satisfactory.

22. During plaintiff's employment, her performance was not a serious concern and her job with Blue Cross was never in jeopardy.

23. During her training, plaintiff had a tendency to ask work-related questions to her coworkers. This was discouraged by supervisors and quality checkers because it took the coworkers away from their own work and they may not know the correct answer.

24. Plaintiff testified that Bowman told her not to ask questions of other train-

ees because it could affect their performance time.

25. On Friday, March 6, 1998, plaintiff e-mailed Susan Bowman to ask whether she could ask "quick" questions other than during her question time. That same day, Bowman replied as follows:

> While trainees are on their graphs, they have assigned question time. Once you are off of your graph, you will have open question times as the other correspondents do. In the mean time, please adhere to your question time. Thank you.

Plaintiff recalled that she received this response to her e-mail.

26. Plaintiff's grades were negatively impacted because Blue Cross found that plaintiff failed to correct mistakes on the March 26, 1998, quality check form, despite two attempts to do so.

27. On Friday, April 3, 1998, Susan Bowman sent the following e-mail to four members of the unit, including plaintiff:

IMPORTANT REMINDER;

> When you receive enlighteners or errors, you must make sure that they are all corrected before turning your file back in for quality. If they go back to quality without being corrected, it is again an error. Not doing so is adversely effecting your accuracy levels. Please let me know if you do not understand this or have any questions about this.
>
> Thank you and have a good weekend!

Plaintiff does not deny that she received this e-mail; she simply does not recall receiving it.

28. Plaintiff testified that the number of enlighteners she received did not have an adverse affect on her job; she was never told that she would be demoted, fired, or receive a pay cut as a result of the number of enlighteners she received.

29. Plaintiff's accuracy for the next week (April 6—10, 1998) was only 85%, meaning that plaintiff did not successfully complete Week 9 of the graph on her first attempt. Therefore, beginning on April 13, 1998, Plaintiff had to repeat Week 9 of the graph.

30. Plaintiff was not the only trainee who had to repeat a week of the training graph. Joni Lippert, who began as a Data Match trainee and eventually became a quality checker, had to repeat a week of the Data Match graph.

31. On Wednesday April 15, 1998 (during plaintiff's second attempt at Week 9 of her graph), plaintiff spoke with Bowman about what plaintiff allegedly saw as inconsistencies in quality checking procedures in the unit.

32. In response to plaintiff's comments, Bowman sent plaintiff an e-mail the following day, which stated in part:

> As you recall, when you and I reviewed your errors together, we discovered that two of the errors that were brought to your attention had not been corrected when you turned your file back in to quality resulting in additional errors ... As you know, all errors must be corrected on the inquiries/files that you work. Continually failing to do so has adversely effected your accuracy level. We have repeatedly reminded you of this point, and you continue to turn files in that are not fully corrected.
>
> If you have questions about this situation, please let me know and I will be glad to answer them.

33. Later in the day on April 15, 1998, Bowman sent the following e-mail to plaintiff:

> Geri, just wanted to let you know that your accuracy for this week so far is at 87%. To meet the requirements of

the 9th week of your graph, you would need to have a 92% for the week. As previously discussed, not correcting your errors before turning them back in to quality has adversely affected your accuracy level. Please let me know if you have questions about this. Plaintiff recalled receiving this e-mail.

34. Plaintiff was able to raise her accuracy percentage and passed Week 9 of her graph with a 92.5% average.

35. As a result, Bowman sent plaintiff the following e-mail on Tuesday, April 21, 1998: "Geri, I m very pleased to see that you have successfully completed the 9th week of your training graph, and are now working on week 10. Keep up the great work!" Plaintiff recalled receiving this e-mail.

36. Bowman continued to encourage plaintiff by sending plaintiff the following e-mail on April 27, 1998, after plaintiff had successfully completed Week 10:

Geri, congratulations on successfully completing week 10 of your training graph. Keep up the good work!!

Plaintiff recalled receiving this e-mail from Bowman.

37. On Tuesday, May 5, 1998, plaintiff e-mailed her resignation to Susan Bowman, stating that her last day would be Friday, May 8, 1998. Plaintiff had spoken with Bowman about this the day before.

38. Bowman responded to plaintiff with her "best wishes to [her] on [her] new job," and forwarded plaintiff's e-mail to the Human Resources department. Plaintiff testified that she recalled these e-mails.

39. Bowman testified that plaintiff told her she was leaving Blue Cross for another job, and plaintiff admitted that she may have told someone so.

40. Plaintiff testified that she did not file for unemployment compensation upon leaving Blue Cross because she had another job.

41. Plaintiff had an exit interview with Susan Bowman and Pat Mulligan on May 8, 1998.

42. Also on May 8, 1998, Plaintiff had an Exit Interview with Blue Cross's then-EEO Coordinator Joy Hill. During the Exit Interview, plaintiff filled out an Exit Interview form but refused to sign it. In response to the question: "What is the real reason for termination?" plaintiff responded, in part:

Dissatisfied with training. The ones they like they push on through the training . . .

I have heard probably 50 complaints about Tracy [sic] Kramer. No one wants to come to Data Match. If they want to keep a person, then that person will pass.

If they don t want to keep the person, that person will fail . . .

There are a lot of other issues also that I won t go into.

The other trainee prepared a Transaction Voucher which was wrong, Tracey Kramer gave her 100%. On my Transaction Voucher, she picked mine apart.

Tracy didn't like me so she would make sure I failed.

I feel this is racially motivated.

43. Plaintiff testified that she never complained about race discrimination to any of her supervisors or to Blue Cross management prior to the Exit Interview with Joy Hill on May 8, 1998.

44. During plaintiff's employment with Blue Cross, no racial comments were made to her or about her by any Blue Cross supervisor.

45. Blue Cross never considered terminating Plaintiff's employment.

## ANALYSIS

### I. Disparate Treatment

Defendant seeks summary judgment on plaintiff's claim that she was subjected to discriminatory terms and conditions of employment in the manner in which she received or failed to receive on-the-job training.

■ Title VII prohibits employers from discriminating with respect to "terms, conditions, or privileges of employment," on account of an individual's race, color, religion, sex or national origin. 42 U.S.C. § 2000e 2(a)(1). Training, although not specifically listed, is considered to be one such term or condition of employment.

■ The standards for determining such claims are well established. To prevail on her Title VII claim, plaintiff "must prove . . . that [defendants] had a discriminatory motive or intent." *Ortega v. Safeway Stores, Inc.,* 943 F.2d 1230, 1236 (10th Cir.1991). She must demonstrate that her race was the motivation for her supervisors' employment decisions. *See E.E.O.C. v. Flasher Co., Inc.,* 986 F.2d 1312, 1319 (10th Cir.1992) (essence of a disparate treatment claim is intentional discrimination based upon a protected classification).

■ Absent direct evidence, plaintiff may use an indirect method to prove discrimination. *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 252–53, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981) (citing *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)). Plaintiff has the initial burden of proving her prima facie case of discrimination. *Id.* The burden then shifts to the defendants to "articulate some legitimate, nondiscriminatory reason for [its conduct]." *Id.* If the defendants carry this burden, it shifts back to the plaintiff to prove that the reasons proffered "by the defendant[s] were not [its] true reasons, but were pretexts for discrimination." *Id.*

Despite the framework of shifting burdens, the ultimate burden of persuasion resides at all times with the plaintiff. *Id. See Wright v. State Farm Mut. Auto. Ins. Co.,* 911 F.Supp. 1364, (D.Kan.1995), *aff'd,* 94 F.3d 657 (10th Cir.1996) (Table).

■ In this case, plaintiff can make a prima facie case of inadequate training by showing: (1) that she is within a protected class; (2) that she was entitled to the desired terms and conditions of employment; (3) that defendant denied plaintiff the desired terms and conditions of employment; and (4) that similarly situated non-protected employees were granted the desired terms, conditions, and privileges of employment. *See Wright,* 911 F.Supp. at 1373; *McCarter v. West,* 910 F.Supp. 519, 524 (D.Kan.1995); *Braun v. Dillon Companies, Inc.,* 1995 WL 261142, *6 (D.Kan. April 19, 1995); *Hanson v. Beloit Newspapers, Inc.,* 1995 WL 646808, *8 (D.Kan. Sept. 15, 1995); *Russell v. Boeing Co.,* 1994 WL 401075, *2 (D.Kan. July 15, 1994); *Moore v. Norfolk and Western Ry. Co.,* 731 F.Supp. 1015, 1019 (D.Kan.1990); *Boyd v. Telecable of Overland Park, Inc.,* 752 F.Supp. 388 (D.Kan.1990).

■ To survive defendants' motion for summary judgment, plaintiff must establish each element of her prima facie case. Plaintiff is African American, and meets the first element. The critical issue is whether the defendants' agents treated non-protected employees more favorably than the plaintiff under comparable circumstances. *See Ortega,* 943 F.2d at 1236; *Drake v. City of Fort Collins,* 927 F.2d 1156, 1159 (10th Cir.1991).

Plaintiff alleges that she did not receive the same on-the-job training as her white counterparts, in that: 1) she was not permitted to ask questions outside the designated question period; 2) her questions asked within the designated period were ignored; 3) white counterparts often re-

ceived extended question periods and hers were often deferred, shortened or denied; 4) she received delayed and less training for handling telephone inquiries; 5) plaintiff's work performance was constantly "knit-picked" (sic) by her supervisors and trainers, and 6) plaintiff was not afforded retraining when she had to repeat one week's work.

These assertions find no support in any documentation or deposition testimony but are instead based solely upon plaintiff's affidavit, attached to her response to the summary judgment motion. That affidavit, which constitutes three of only nine pages of record submitted in support of plaintiff's response, is dated May 7, 2001, the very date such response was filed.

The court first addresses plaintiff's assertion that her question time period was deferred. In her deposition, plaintiff testified that her question time period was never deferred. It contains the following exchange:

Q. Was there a time where the question time period was deferred?

A. It was attempted to be deferred.

Q. Oh, but it never was?

A. It never was.

■ Dk. 40, Plaintiff's depo. p. 67. *See also id,* p. 60–61. Plaintiff did not demonstrate any confusion at the time she was asked these questions in her deposition, her counsel was available for cross-examination at the time, and plaintiff's recent affidavit is not alleged to be based upon any newly discovered evidence. Therefore, to the extent plaintiff's affidavit contradicts her deposition testimony, it will be disregarded. *See Franks v. Nimmo,* 796 F.2d 1230, 1237 (10th Cir.1986) (regarding conflicting affidavits). Plaintiff's assertion that her question time period was "often deferred or denied" lacks merit.

The same is true for plaintiff's claims that she was not permitted to ask questions outside her designated question peri-od, but that her white counterparts were. The record provides some insight into this issue. It shows that on March 6, 1998, plaintiff sent an E-mail to supervisor Bowman, asking: "Are we allowed to ask questions, if they are quick, other than question time? I have noticed where this is occurring, so I thought I might check with you." (Dk.31, Exh. J, p. 1.) Supervisor Bowman replied to plaintiff that same day: "While trainees are on their graphs, they have assigned question times. Once you are off of your graph, you will have open question times as the other correspondents do. In the mean time, please adhere to your question time." (*Id.*) Later that month, plaintiff and all trainees received the following written memo about question time from Shirley Wooten: "Please remember to hold your questions for question time. If you need an immediate answer on something come see me. If I'm not available you can ask Tracey. If you have any questions please feel free to come see me." (Dk. 37, Exh. A to plaintiff's affidavit, 3/31/98 memo re: question time).

This correspondence shows that plaintiff was expected to follow the same rules that applied to all trainees, and that after plaintiff notified supervision of her concerns that others were not following the rules but were getting to ask quick questions, they were instructed to follow the rules as well. The conclusory nature of plaintiff's complaint fails to meet plaintiff's burden to show intentional discrimination in her terms and conditions of employment.

■ Plaintiff asserts that her question periods were often shortened, but the question periods of her white counterparts were not. Plaintiff gives no indication of when her question periods were shortened, how often they were shortened, by how many minutes they were shortened, any reasons given for such shortening, or any other details that would shed some light on

the facts, if any, underlying this conclusory statement. "Vague references to the existence of disputed facts, without identifying the factual matters in dispute are insufficient. *See Kidd v. Taos Ski Valley, Inc.,* 88 F.3d 848, 853 (10th Cir.1996) (conclusory allegations not supported by evidence are insufficient to resist summary judgment)" *Lopez v. United States,* 21 Fed. Appx. 879, 882 (10th Cir.2001).

Defendant has presented evidence that all trainees were allotted 20 minutes per day for question period, but that all trainees' question periods were shortened on occasion because of "urgency of workload." (Dk.31, Exh. F, p. 4, ¶ 23.) Such matters reflect defendant's business decision, and are accorded a great deal of deference. *See Branson v. Price River Coal Co.,* 853 F.2d 768, 771 (10th Cir.1988). No inference of discrimination arises from these facts.

Plaintiff additionally alleges that the questions she was able to ask during her question period were ignored. The generic nature of this complaint makes it nearly impossible to address, as plaintiff has provided no examples or facts in support of her conclusion, and has not specified which persons allegedly ignored her,[1] or the frequency with which this event occurred. Defendant has shown, however, that plaintiff's own testimony in her deposition reveals that supervisor Bowman did in fact take some action in response to plaintiff's concerns about certain requirements, in eliminating a portion of them from the training regimen. (Dk. 31, plaintiff's depo. p. 41; Dk. 40, plaintiff's depo. p. 63–64.) Plaintiff's allegation that unnamed persons ignored her questions or concerns is thus unsupported and conclusory.

As for plaintiff's complaint that her work was nit-picked while the work of white counterparts was not, the record does show two specific incidents which plaintiff may be alluding to: 1) that Cris Pulatie did not have trouble "getting past" the quality checks and had received a 100% mark on something she had really 'screwed up' (Dk. 40, Plaintiff's depo., p. 68–69.); and 2) that Joni Lippert corrected errors ("enlighteners") for Chris Pulatie. *Id.,* p. 69.

Defendant objects that these statements are hearsay in nature, as plaintiff conceded that the source of her information for both incidents was a conversation with Chris Pulatie. (Dk. 40, Plaintiff's depo., p. 68–60.) The court agrees. *See Bateman v. United Parcel Service, Inc.,* 2002 WL 241300, *3, 31 Fed.Appx. 593 (10th Cir. 2002) (Table) (finding plaintiff's testimony regarding the different treatment of her male co-workers, which was not based on personal knowledge but on what she was told by others, to be inadmissible hearsay.) No other evidence supports plaintiff's conclusory assertion that supervisors applied stricter criteria when evaluating her work than they did in evaluating the work of the white trainees.

Plaintiff additionally contends that she was not afforded retraining when she had to repeat one week's work. Plaintiff fails to specify what the desired retraining was, fails to show that such retraining was in fact available, and fails to allege that any white trainees ever received similar retraining. Instead, the record shows that Joni Lippert, who is white, also failed one week's work and had to repeat it, and does not show that Lippert received any "retraining" other than that necessarily incurred in the repetition of the week's

---

1. The record shows that plaintiff had several supervisors and quality checkers during her employment with the defendant.

work. (Dk.31, Exh. G, p. 3). No inference of discrimination is raised by the fact that plaintiff had to repeat one week's work because she failed to meet the required percentages. *See* Dk. 31, Exh. F, p. 3, ¶ 20 (supervisor's statement that it was not uncommon for trainees to have to repeat a week of training for failing to meet the required percentages); Dk. 31, Exh. G, p. 3, ¶ 13 (same).

This leaves solely plaintiff's complaint of delayed and less training for handling telephone inquiries. Plaintiff did not contradict the fact, however, that for classroom training, "the trainees received instruction on the same topics at the same time and were given the same worksheets." (Dk. 30, uncontroverted fact no. 8.) Even assuming that the telephone training of which plaintiff complains was not in the classroom but was on-the-job training, plaintiff fails to specify what additional training she desired, the length of time such training was allegedly delayed, the time she spent in such training compared to the time white counterparts spent in that training, or to allege that such presumed failings somehow affected her performance. In short, the record fails to show any evidence whatsoever in support of this conclusory assertion.

As the above discussion illustrates, the vast majority of plaintiff's allegations are conclusory, unconstrained by reference to any specific dates, places, persons, examples, or other contextual details which would enable the court to analyze the issues or would give the defendant some means of addressing the assertions. Plaintiff's conclusory statements regarding training do not create a genuine issue of material fact. *See BancOklahoma Mortgage Corp. v. Capital Title Co., Inc.*, 194 F.3d 1089, 1101 (10th Cir.1999) ("While an affidavit is certainly an appropriate vehicle to establish a fact for summary judgment

purposes, the affidavit must set forth facts, not conclusory statements.")

■■■■ Further, plaintiff has failed to present evidence that the training she desired but failed to receive, whether viewed independently or collectively, had any impact whatsoever upon her position or her ability to retain it. *See Amro v. Boeing Co.*, 232 F.3d 790, 797 (10th Cir.2000) (finding mere delay in obtaining a transfer, in the absence of some other negative or unfavorable effect from that delay, fails to constitute an adverse employment action; "adverse employment" action was not element in prima facie case). Instead, the record shows that plaintiff performed her tasks at least satisfactorily, was progressing through the requisite training, and was in no danger of being terminated.

The court concludes that plaintiff has failed to raise a material question of fact that defendants provided similarly situated non-protected employees with training not available to her. Accordingly, plaintiff has not made a prima facie showing of disparate treatment in the terms and conditions of her employment based on her race. Summary judgment on this claim is well warranted.

## II. Hostile Work Environment

■■■■ Plaintiff's brief is peppered with references to the existence of a racially hostile work environment. Assuming, arguendo, that plaintiff has preserved this claim, plaintiff must assert facts that support an inference of a hostile work environment and a basis for liability. *Bolden v. PRC Inc.*, 43 F.3d 545, 551 (10th Cir. 1994). She must demonstrate that defendants' conduct " 'ha[d] the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment.' " *Martin v. Nannie and the Newborns, Inc.*, 3 F.3d 1410, 1418 (10th

Cir.1993) (quoting *Meritor Sav. Bank v. Vinson,* 477 U.S. 57, 65, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986)).

Plaintiff bases her harassment claim upon all of the allegedly improper employment actions discussed supra, claiming the aggregated acts created a racially hostile work environment. However, since the court has found plaintiff's allegations of discrimination in the various terms and conditions of employment to be untenable, they cannot serve as a foundation for plaintiff's harassment claim. *See Moore,* 731 F.Supp. at 1020. Plaintiff alleges no racially derogatory comments or even isolated racial acts, and thus has no independent factual foundation for this claim.

■■■ The federal discrimination laws do not require employers to treat all employees equally; rather, they prohibit employers "from meting out unequal treatment based on race." *Clark v. Atchison, Topeka and Santa Fe Ry. Co.,* 731 F.2d 698, 702 (10th Cir.1984). In the present case, plaintiff's evidence of discrimination consists exclusively of her own conclusory statements that she was not treated as well as white employees in minor respects. Such evidence is insufficient to survive defendant's motion for summary judgment on plaintiff's claim of race discrimination, under a hostile work environment or other theory.

## III. Constructive Discharge

■■■ Defendant additionally seeks summary judgment on plaintiff's claim of constructive discharge. Constructive discharge can be a cognizable claim under Title VII. *See Thomas v. Denny's, Inc.,* 111 F.3d 1506, 1514 (10th Cir.), *cert. denied,* 522 U.S. 1028, 118 S.Ct. 626, 139 L.Ed.2d 607 (1997). In order to make out a constructive discharge claim, the plaintiff must allege facts sufficient to demonstrate under an objective test that a reasonable person would have viewed her working conditions as intolerable. *Jeffries v. State of Kansas,* 147 F.3d 1220, 1233 (10th Cir. 1998). "That is to say the working conditions, when viewed objectively, must be so difficult that a reasonable person would feel compelled to resign.... Essentially, a plaintiff must show that she had no other choice but to quit." *Yearous v. Niobrara County Memorial Hosp.,* 128 F.3d 1351, 1356 (10th Cir.1997) (quotation marks and citations omitted), *cert. denied,* 523 U.S. 1074, 118 S.Ct. 1515, 140 L.Ed.2d 669 (1998).

■■■ A plaintiff's own assessment of the working conditions, standing alone, generally "is insufficient to create a factual question for the jury as to whether a constructive discharge occurred. The test for constructive discharge is an objective one." *Ulrich v. K–Mart Corp.,* 858 F.Supp. 1087, 1093 (D.Kan.1994), *aff'd,* 70 F.3d 1282 (10th Cir.1995) (Table).

■■■ Plaintiff bases her constructive discharge claim on the hostile environment allegedly created by the discriminatory actions relating to her training. To show that she was constructively discharged, plaintiff relies upon the same facts upon which her race discrimination case is based. The court finds that those facts, discussed in detail above, fall far short of showing that plaintiff's working conditions, when viewed objectively, were so difficult that a reasonable person would feel compelled to resign.

Additionally, the record shows the following regarding plaintiff's termination of her employment: 1) plaintiff told supervisor Bowman on May 4, 1998, that she was leaving to take another job, (Dk. 31, Exh. F, ¶ 29); 2) plaintiff e-mailed notice to supervisor Bowman on May 5, 1998, that her last day would be May 8, 1998 (Dk. 31, Exh. J, Bates # B000062); 3) supervisor Bowman sent plaintiff on May 5th her "best wishes to [her] on [her] new job"

(*Id.*); 4) plaintiff left defendant's employment on May 8, 1998, as she anticipated; and 5) plaintiff admitted that she did not file for unemployment compensation upon leaving defendant's employment because she had another job working elsewhere. (Dk. 31, Exh. A, plaintiff's depo. p. 16.) Summary judgment is clearly warranted on this claim.

## IV. Retaliation

The court has no need to rule upon plaintiff's claim of retaliation, given the fact that plaintiff has expressly abandoned it. (Dk. 37, p. 3: "Finally, as to Plaintiff's claim of retaliation, Plaintiff would advise the Court that she withdraws from consideration said claims.")

IT IS THEREFORE ORDERED that defendant's motion for summary judgment (Dk. 29) is granted.