IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
May 10, 2005 Session

## MOLD-TECH USA, LLC v. HOLLEY PERFORMANCE PRODUCTS, INC.

**Appeal from the Circuit Court for Hamilton County**
**No. 02C275     L. Marie Williams, Judge**

**Filed August 26, 2005**

**No. E2004-01938-COA-R3-CV**

Mold-Tech USA, LLC ("the Supplier") brought this action against Holley Performance Products, Inc. ("the Manufacturer") for breach of contract, seeking to recover the cost of component parts purchased by the Supplier in connection with its contract with the Manufacturer. Following a bench trial, the court found that the Manufacturer had breached the contract, and the court awarded the Supplier $79,436.87 in damages. In addition, the court awarded the Supplier prejudgment interest at the rate of 4% per annum. The Manufacturer appeals, arguing that the trial court erred in finding for the Supplier because the Supplier failed to comply with the pertinent provisions of the Tennessee version of the Uniform Commercial Code. The Manufacturer also contends that the Supplier is not entitled to prejudgment interest. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court**
**Affirmed; Case Remanded**

CHARLES D. SUSANO, JR., J., delivered the opinion of the court, in which HERSCHEL P. FRANKS, P.J., and SHARON G. LEE, J., joined.

M. Andrew Pippenger, Chattanooga, Tennessee, for the appellant, Holley Performance Products, Inc.

Thomas L. N. Knight, Chattanooga, Tennessee, and Rebecca L. Hicks, Dayton, Tennessee, for the appellee, Mold-Tech USA, LLC.

### OPINION

### I.

Beginning in December, 1999, the Manufacturer, which makes component systems for automobiles, established an open account with the Supplier, a manufacturer of circuit boards, to make three different types of circuit boards, referred to as 192A, 154A, and 202A; the Manufacturer planned to install the circuit boards in automobile ignition systems. With each circuit board, the Manufacturer submitted to the Supplier a request for a quotation, which included, *inter alia*, the

design of the circuit board and a bill of materials listing all of the specific items the Supplier would need to obtain in order to make the circuit boards. After receiving a formal quotation back from the Supplier, the Manufacturer would submit a purchase order containing the specific delivery dates for each installment of the circuit boards and the terms of payment, which were originally "Net 45."

Immediately after receiving a purchase order, the Supplier would begin procuring the parts needed to make the circuit boards, as many parts were specialty items that could take up to twelve weeks to receive. The Manufacturer was aware that it was necessary for the Supplier to obtain these parts in advance of their immediate need in order to fulfill the orders in a timely fashion. Moreover, in order to receive the best possible pricing, the Supplier would purchase all necessary parts up front rather than purchasing parts little by little as it manufactured each installment.

With each of the three circuit boards, the original purchase orders specified that an installment would be delivered to the Manufacturer on what was essentially a monthly basis. Beginning in March, 2000 – a mere three months after submitting the first purchase order – the Manufacturer started requesting delays in delivery of the installments, a practice that continued with each of the circuit boards. The Manufacturer was experiencing several problems, which led to the delay requests. The Manufacturer's engineers were having difficulty getting some of the circuit boards to operate properly, so it asked for more time so the engineers could make changes to the design of the boards. Moreover, the Manufacturer was experiencing significant cash flow problems, which restricted the amount of product it could afford to accept for delivery. In an effort to accommodate the Manufacturer, the Supplier agreed to all of these requests for delivery delays.

In addition to affecting the delivery schedule, the cash flow problems of the Manufacturer led to chronic late payments to the Supplier. While the original payment terms were "Net 45," the Supplier eventually agreed to change the terms to "Net 60." However, even after the payment terms were changed, the Manufacturer was still late in making payments. Cheryl Barton, the former corporate vice president of the Supplier, testified at trial that out of 89 invoices billed to the Manufacturer, only four were paid according to the payment terms, and less than one-third were paid within seven days of the due date. Ms. Barton further testified that, on average, it took the Manufacturer 80.18 days to pay its invoices, even at the original payment terms of "Net 45."

While problems with design and cash flow led to the request to delay delivery of circuit boards 192A and 154A, the Manufacturer experienced even greater problems with 202A, as its products were not selling as well as had been anticipated. In early March, 2001 – following repeated requests to delay delivery of the 202As – the Manufacturer contacted the Supplier to inquire as to the cost of canceling the entire order of the 202As. At that time, Ms. Barton began keeping a collection attempt diary, noting all of her attempts to contact the Manufacturer about its past due accounts. Ms. Barton stated at trial that she began keeping the diary because the Manufacturer was "past 30 days on some of [its] accounts, at least two invoices, fairly large invoices" and she was "concerned that [the Manufacturer was] not negotiating in good faith at that point and that [it was] breaching [its] contract." Between March 2, 2001, and March 23, 2001, the diary indicates that Ms. Barton spoke with four different employees of the Manufacturer on six different dates before finally

receiving a check on March 28, 2001. From March 30, 2001, through April 11, 2001, Ms. Barton either spoke with or left messages for employees of the Manufacturer on five different occasions regarding payment, though no information was given to her to indicate when she might receive the next check from the Manufacturer.

On April 11, 2001, the Supplier's owner made the decision to stop shipping product to the Manufacturer due to the Manufacturer's failure to make payments; at that time, the Manufacturer was delinquent on invoices of almost $43,000. At the same time, the owner made the decision to close the Supplier's plant in Soddy Daisy, the facility where all of the Manufacturer's circuit boards were made. The closing was to take effect at the end of June, 2001.

Following the decision on April 11, 2001, to stop shipment to the Manufacturer, Ms. Barton made roughly 14 phone calls to the Manufacturer over the next two weeks and spoke with numerous individuals before finally receiving checks on April 26 and 27. In early May, 2001, the Manufacturer contacted the Supplier to inquire as to what needed to be done to get its orders processed. At that time, Ms. Barton began negotiating with Lisa Mitchell, the Manufacturer's director of corporate purchasing, in an attempt to structure a proposal to bring the Manufacturer's account current and to work out a schedule for the Supplier to make the remaining circuit boards before the plant closed at the end of June. The two women exchanged a series of emails to this effect, which included a payment schedule for the invoices past due, and a statement that the Supplier would manufacture the remaining circuit boards and ship them by June 30, 2001. However, despite numerous revisions to the proposal, no agreement was ever reached.

On May 15, 2001, Ms. Barton emailed Ms. Mitchell with a revision to the proposed letter of intent, noting in the email that the Supplier would "begin production immediately upon receipt of a signed letter of intent." One week later, Ms. Barton emailed Ms. Mitchell and Bob Rucker, the Manufacturer's purchasing agent, stating the following:

> I am waiting to hear from you folks regarding the letter of intent. We will have some machine time available and I have tentatively "plugged" [the Manufacturer] into it with the optimism we will be able to come to a mutually beneficial decision.
>
> If there are questions please do not hesitate to contact us. Be aware that time is slipping away from us and we have firm commitments made to other customers.

After receiving no response to her email, Ms. Barton again emailed Ms. Mitchell and Mr. Rucker the following day:

> It is becoming critical that this situation be resolved. As stated [in my previous email] our available machine time is limited and we would like to make certain [the Manufacturer's] product is scheduled.

-3-

Please contact me to resolve this matter.

The Manufacturer did not respond to this email, and no payment had been sent to the Supplier since April 27. At some point thereafter, Ms. Barton spoke with Ms. Mitchell and Mr. Rucker and ascertained that the Manufacturer was unwilling to agree to the terms of the proposal due to an issue over product certification. At this time, the parties had reached an impasse and the contract between the two parties was effectively cancelled.

The plant was closed in early July, 2001. The Manufacturer finally paid the past due invoices by the end of July, 2001, though the Supplier was still holding the parts for all of the circuit boards that had yet to be produced.

On January 29, 2002, the Supplier filed the instant action against the Manufacturer for breach of contract, seeking payment for its costs incurred in the purchase of the unused parts inventory. The case proceeded to a bench trial, at the conclusion of which the trial court found in favor of the Supplier. The trial court made the following findings:

> The Court finds the whole contract was substantially impaired because of the necessity of the [Supplier] to purchase the component parts based on the proposal for bid submitted by [the Manufacturer], the changes in the delivery schedule and production dates, and the subsequent inability or refusal of [the Manufacturer] to make payments in a timely manner. The accommodation of the [Supplier] to the delay in schedule requested by [the Manufacturer] does not absolve the [Manufacturer] of the responsibility to pay for units which have been delivered in a timely manner. [The Manufacturer's] continued requests for rescheduling and failure to pay together result in a substantive impairment of the value of the whole contract (47-2-612), thereby resulting in the right to proceed to T.C.A. 47-2-703 remedies.
>
> * * *
>
> [The Manufacturer] was in default at the time the contract was cancelled.
>
> Accordingly, judgment is entered in the amount of $79,436.87 for the unused component parts and the seven assembled units of 202A, plus storage fees. . . .

Following the entry of this judgment, the Supplier filed a motion to alter or amend requesting prejudgment interest, which motion was granted at the rate of four percent per annum. From this judgment, the Manufacturer appeals.

II.

In this non-jury case, our review is *de novo* upon the record of the proceedings below; but the record comes to us with a presumption of correctness as to the trial court's factual findings that we must honor unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d); ***Wright v. City of Knoxville***, 898 S.W.2d 177, 181 (Tenn. 1995); ***Union Carbide Corp. v. Huddleston***, 854 S.W.2d 87, 91 (Tenn. 1993). The trial court's conclusions of law, however, are accorded no such presumption. ***Campbell v. Florida Steel Corp.***, 919 S.W.2d 26, 35 (Tenn. 1996); ***Presley v. Bennett***, 860 S.W.2d 857, 859 (Tenn. 1993).

III.

The issues raised in the pleadings, and the trial court's findings, cause us to focus on the following statutory provisions:

*Tenn. Code Ann. § 47-2-106 (2001)*

(4) "Cancellation" occurs when either party puts an end to the contract for breach by the other and its effect is the same as that of "termination" except that the cancelling party also retains any remedy for breach of the whole contract or any unperformed balance.

\* \* \*

*Tenn. Code Ann. § 47-2-612 (2001)*

(1) An "installment contract" is one which requires or authorizes the delivery of goods in separate lots to be separately accepted, even though the contract contains a clause "each delivery is a separate contract" or its equivalent.

\* \* \*

(3) Whenever nonconformity or default with respect to one (1) or more installments substantially impairs the value of the whole contract there is a breach of the whole. But the aggrieved party reinstates the contract if he accepts a nonconforming installment without seasonably notifying of cancellation or if he brings an action with respect only to past installments or demands performance as to future installments.

*Comments to Official Text of § 47-2-612*

\* \* \*

(6) Subsection (3) is designed to further the continuance of the contract in the absence of an overt cancelation. . . . Whether the non-conformity in any given installment justifies cancelation as to the future depends, not on whether such non-conformity indicates an intent or likelihood that the future deliveries will also be defective, but whether the non-conformity substantially impairs the value of the whole contract. If only the seller's security in regard to future installments is impaired, he has the right to demand adequate assurances of proper future performance but has not an immediate right to cancel the entire contract. It is clear under this Article [Chapter], however, that defects in prior installments are cumulative in effect, so that acceptance does not wash out the defect "waived." . . .

\* \* \*

*Tenn. Code Ann. § 47-2-703 (2001)*

Where the buyer . . . fails to make a payment due on or before delivery or repudiates with respect to a part or the whole, then with respect to any goods directly affected and, if the breach is of the whole contract (§ 47-2-612), then also with respect to the whole undelivered balance, the aggrieved seller may:

(a) withhold delivery of such goods;

\* \* \*

(e) recover damages for nonacceptance (§ 47-2-708) or in a proper case the price (§ 47-2-709);

(f) cancel.

*Comments to Official Text of § 47-2-703*

\* \* \*

2. The buyer's breach which occasions the use of the remedies under this section may involve only one lot or delivery of goods, or may involve all of the goods which are the subject matter of the particular contract. The right of the seller to pursue a remedy as to all the goods when the breach is as to only one or more lots is covered by the section on breach in installment contracts. The present section deals only with the remedies available after the goods involved in the breach have been determined by that section.

* * *

IV.

A.

We believe the issues raised by the Manufacturer are best stated as follows:

1. Did the trial court err in determining that the Manufacturer's failure to make timely payments constituted a breach of the contract as a whole, thereby justifying cancellation of the contract?

2. Assuming the failure to make timely payments did *not* constitute a breach of the contract as a whole, did the Supplier properly demand adequate assurances of future performance, pursuant to Tenn. Code Ann. § 47-2-609?

3. If the Supplier did properly cancel the contract, did the Supplier reinstate the contract by accepting late payments from the Manufacturer?

4. Did the trial court err in awarding the Supplier prejudgment interest at the rate of four percent?

We will address each of these issues in turn.

B.

The primary issue in this case involves a determination as to whether the Manufacturer's failure to make timely payments substantially impaired the value of the whole contract, resulting in a breach of that contract and justifying cancellation. In order to resolve this issue, we must turn to the Tennessee version of the Uniform Commercial Code, codified at Chapter 47 of the Tennessee Code. For ease of reference, we will refer to the Tennessee version of the Uniform Commercial Code as "the UCC."

Because the contract at issue is an installment contract, we begin our analysis with Tenn. Code Ann. § 47-2-612(3), which provides that a breach of the whole contract occurs whenever "default with respect to one (1) or more installments substantially impairs the value of the whole contract." This statute is addressed in the official comment, which states that "[i]f only the seller's security in regard to future installments is impaired," the seller has the right "to demand adequate assurances of proper future performance," but it does not have the " immediate right to cancel the entire contract." Thus, the issue turns on what constitutes substantial impairment of the contract as a whole.

"Substantial impairment" is not defined in the UCC, and other courts have held that a determination of substantial impairment of the value of the whole contract presents a question of fact. *Bill's Coal Co. v. Bd. of Pub. Utils.*, 887 F.2d 242, 247 (10th Cir. 1989); *Holiday Mfg. Co. v. B.A.S.F. Sys., Inc.*, 380 F. Supp. 1096, 1102 (D. Neb. 1974); *Cherwell-Ralli, Inc. v. Rytman Grain Co.*, 180 Conn. 714, 433 A.2d 984, 986 (1980); *Graulich Caterer, Inc. v. Hans Holterbosch, Inc.*, 101 N.J.Super. 61, 243 A.2d 253, 262 (1968). While we are aware of no Tennessee cases on point, several cases from other jurisdictions are instructive on this issue.

In *L&M Enters., Inc. v. BEI Sensors & Sys. Co.*, BEI entered into a contract to manufacture aircraft-related items for L&M. 231 F.3d 1284, 1285 (10th Cir. 2000). By October, 1995, L&M owed BEI over $400,000, more than $200,000 of which was over 90 days in arrears. *Id.* The parties entered into an agreement addressing payment of the amounts past due as well payment of future shipments, but L&M failed to comply with the terms of that agreement. *Id.* at 1285-86. After further attempts to resolve the payment issue failed, BEI cancelled its contract with L&M "for failure to pay amounts due." *Id.* at 1286-87. The trial court held that BEI was justified in cancelling the contract because L&M breached the contract by failing to make timely payments. *Id.* at 1287. The Tenth Circuit agreed, citing the Kansas version of the Uniform Commercial Code requiring substantial impairment in order to establish a breach of the whole contract and stating the following:

> In the instant case, L & M completely failed to make timely payments. We agree with the courts that have held implicitly that *an undisputed failure to pay for shipments establishes, as a matter of law, substantial impairment justifying cancellation as to the future undelivered balance of a contract.*

*Id.* at 1288 (emphasis added) (citing *Heating & Air Specialists, Inc. v. Jones*, 180 F.3d 923, 933 (8th Cir. 1999) (holding that supplier was justified in canceling contract with manufacturer due to manufacturer falling "seriously behind" on payments); *Frigiking, Inc. v. Century Tire & Sales Co.*, 452 F.Supp. 935, 938 (N.D. Tex. 1978) (holding that Frigiking was entitled to cancel its contract with Century Tire due to the latter's "chronic large overdue balances" which impaired the whole contract)).

Turning to the instant case, it is undisputed that the Manufacturer owed close to $43,000 on past due invoices at the time the Supplier canceled the contract. It is further undisputed that the

Manufacturer had been chronically late on paying virtually every invoice. According to Ms. Barton, only four out of eighty-nine invoices had been paid on time. The testimony at trial revealed that Ms. Barton made dozens of attempts to contact the Manufacturer to resolve payment issues and that most of these attempts resulted in unreturned phone calls or empty promises along the lines of "the check is in the mail." Certainly, this is a clear-cut case of an undisputed failure to pay for shipments, which, as the Tenth Circuit has held, establishes, *as a matter of law*, "substantial impairment justifying cancellation as to the future undelivered balance of a contract." **L&M Enterprises**, 321 F.3d at 1288. Accordingly, we agree with the trial court that this failure to make timely payments constituted a breach of the contract as a whole, pursuant to § 47-2-612(3), thereby justifying the Supplier's cancellation of the contract.

C.

The Manufacturer argues that only the Supplier's security with respect to future installments was impaired, and that, under the comment to § 47-2-612, this did not entitle the Supplier to cancel the whole contract; rather, the Supplier's remedy was to seek adequate assurances of proper future performance pursuant to Tenn. Code Ann. § 47-2-609. The Manufacturer's reliance on this language is misplaced. This is not a situation where all accounts were current and the Supplier was simply concerned – for whatever reason – that the Manufacturer might not be able to pay for future installments in a timely fashion, or at all. Rather, the Manufacturer was significantly behind in payments for shipments it had already received and had established a pattern of late payments from early on in the parties' relationship. As previously stated, this establishes substantial impairment of the entire contract and not mere insecurity as to future installments. The assurance of proper future performance provisions of Tenn. Code Ann. § 47-2-609 are not implicated by the facts of this case.

D.

Next, the Manufacturer contends that if the Supplier properly canceled the contract, it reinstated the contract by accepting a late payment from the Manufacturer in April, 2001. The Manufacturer relies on the language of Tenn. Code Ann. § 47-2-612(3), which states that the aggrieved party "reinstates the contract if he accepts a nonconforming installment without seasonably notifying of cancellation." We disagree with the Manufacturer's contention. Tenn. Code Ann. § 47-2-612(3) deals with a situation where a party "accepts a nonconforming installment." The Manufacturer would have us read this provision as applying to a seller who accepts a payment for goods previously delivered; but this is not what subsection (3) of the statute says. There is nothing in the statute to indicate that a "nonconforming installment" includes a payment on an account. Furthermore, subsection (1) of the statute makes it clear that the statute is intended to address the delivery of goods in installments. The "nonconforming installment" referred to in subsection (3) is a nonconforming installment of goods. This statute is simply not implicated by the facts of the instant case.

E.

Finally, the Manufacturer contends that the trial court erred in awarding the Supplier prejudgment interest at the rate of 4%, as the parties' contract capped any award of interest at 1%. In support of its contention, the Manufacturer relies upon the Supplier's formal quotation for production of 202A, which included, in its financial terms, a "1% Penalty for all payments made 65 days after invoice." In addition, the Manufacturer points to Tenn. Code Ann. § 47-14-123 (2001), which states that "contracts may expressly provide for the imposition" of a different rate of interest to be paid upon the breach of that contract. Therefore, the Manufacturer argues, the Supplier should be entitled to interest of no more than 1%. We disagree.

While parties can expressly contract for a certain rate of interest, the fact that the parties in the instant case contracted for a 1% penalty on all late payments associated with 202A has no bearing on the amount of prejudgment interest that can be awarded. The Supplier is not seeking to be paid for the amount past due on any 202A invoices; rather, the Supplier is seeking to be paid for the costs associated with the unused inventory it purchased in order to manufacture the 202A circuit boards. As such, the 1% penalty referenced in the purchase order has no applicability to an award of prejudgment interest.

The decision of whether to award prejudgment interest is within the sound discretion of the trial court and will not be disturbed by an appellate court absent "a manifest and palpable abuse of discretion." *Myint v. Allstate Ins. Co.*, 970 S.W.2d 920, 927 (Tenn. 1998). "A trial court acts within its discretion when it applies the correct legal standard and reaches a decision that is not clearly unreasonable." *Bogan v. Bogan*, 60 S.W.3d 721, 733 (Tenn. 2001). In the instant case, the trial court found that an award of prejudgment interest was appropriate as "the amount of damages to which the [Supplier] is entitled is reasonably certain as was the outcome of this case." In addition, the court thought prejudgment interest was in order due to the repeated requests for continuances sought by the Manufacturer in the case, causing the case to languish for close to two and a half years. The court noted that the "purpose of prejudgment interest is to compensate the plaintiff for the lost time value of the money." We cannot say that an award of 4% interest was "clearly unreasonable." *See Bogan*, 60 S.W.3d at 733. Accordingly, we find no abuse of discretion in the trial court's award of prejudgment interest.

V.

The judgment of the trial court is affirmed. This case is remanded to the trial court for enforcement of the judgment and for collection of costs assessed below, all pursuant to applicable law. Costs on appeal are taxed to the appellant, Holley Performance Products, Inc.

_____
CHARLES D. SUSANO, JR., JUDGE